87   117
1ap396
87h 117
59ad571

ALFRED S. HEIDELBACH, as the Survivor, etc., of the Firm of HEIDELBACH, ICKELHEIMER & Co., Respondent, v. THE NATIONAL PARK BANK of New York, Appellant.

*Misappropriation of money held in a fiduciary capacity — tracing the proceeds deposited in a bank — a depositor presumed to have drawn his own rather than another's money — set-off by a bank against its depositor — election of remedies.*

A person having power to sell and deliver merchandise to a purchaser in good faith, may resort to the usual agencies for realizing the purchase money, and when such agencies advance money in good faith and in the usual course of dealing, they are entitled to the same protection as a purchaser of the merchandise.   If, however, any such agency has not parted with the money or changed its position by reason of the transaction, the real owner may invoke the rule of equity, that where a person holding money in a fiduciary capacity misuses or misappropriates it, the real owner can follow it into the hands of the

agency so long as he can identify it, and until it comes into the possession of one who, in good faith, parted with value for it.

Where a party seeks to trace the proceeds of property after it has been deposited in a bank with the individual money of the depositor, it is sufficient, for the purposes of identification, and to establish the character of the proceeds as trust money, to trace the proceeds into the bank, and to show that they were there at the time notice was given of the true owner's rights.

Where a person holding money in a fiduciary capacity pays it into his account at his bankers, and mixes it with his own money, and afterwards draws out some of the money so on deposit by checks, generally, and in the ordinary manner, the drawer of the checks must be deemed to have drawn out his own in preference to the trust money. The rule attributing the first drawing out to the first payment in does not apply to such a case.

A bank cannot set off as against the balance of a depositor in its hands an unmatured claim held by it against such depositor, where the amount on deposit is held by the depositor in a fiduciary capacity, though deposited in his individual name.

In the absence of a contract to that effect between a depositor and the bank, the latter has not the right to retain the balance of a customer's deposit to pay or apply upon the indebtedness of a customer to the bank not yet matured.

Where there are two absolutely inconsistent remedies to which a party is entitled he is not at liberty to enforce both, and the election of one precludes a resort to the other.

An election once made is determined forever, and it may be determined by any decisive act made with full knowledge of all the facts, and the bringing of an action to enforce one of the remedies sufficiently evidences such election; but if a person has two or more consistent, instead of two or more inconsistent remedies, for the recovery of the same debt, he may resort to all, although he can have but one satisfaction.

APPEAL by the defendant, The National Park Bank of New York, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 20th day of April, 1893, upon the decision of the court rendered after a trial at the New York Special Term.

The plaintiff's firm on the 21st day of July, 1887, opened a credit of £10,000 sterling with C. J. Hambro & Son, who were their correspondent bank in London, in favor of E. S. Wheeler, under his firm name of E. S. Wheeler & Co., the credit to be used for the purchase of merchandise in Europe. Thereafter, under said credit, Wheeler purchased in England, and shipped to the Hall & Willis Hardware Company at Kansas City, 600 boxes of tin plate, for which said C. J. Hambro & Son paid, under the authority of said letter of credit, the sum of £815, 8s. sterling, and took the bill of lading

and consular invoice of the merchandise so purchased as evidence of title thereto.    The bill of lading and consular invoice were, pursuant to the terms of credit, duly forwarded to the plaintiff's firm, into whose possession they came about August 27, 1887, and in the due course of business plaintiff's firm paid for the 600 boxes of tin plates.

By virtue of the terms of the credit of £10,000 sterling, and the transaction, to which we have referred, had in pursuance thereof, the plaintiff's firm became the owners of the tin plates on or prior to the date last named.    After the plaintiff's firm came into the possession of the bill of lading and invoice, and on August 27, 1887, they intrusted them, together with the merchandise represented thereby, to E. S. Wheeler & Co., upon the terms and conditions expressed in a contract or trust receipt, of which the following is a copy :

"NEW YORK, *August 27th*, 1887.

Messrs. HEIDELBACH, ICKELHEIMER & Co. :

" GENTS.— We acknowledge the receipt from you of invoice and bill of lading of the following goods, viz., 600 boxes tin plates, equivalent of eight hundred and fifteen pounds eight shillings sterling, shipped by E. S. Wheeler & Co. on board the *Douro* at Liverpool (and the receipt by us of all the goods mentioned in said bill of lading), and we hereby agree to hold the said goods in trust for you as your property until the proceeds thereof are actually turned over to you, such goods being subject to your order and subject to your rights as owners thereof.    The delivery to us of the said bill of lading shall not operate as a waiver of your ownership of the goods therein described, nor a waiver of the due performance of the agreement in the receipt signed by us for your letter of credit by cable, dated July 21, '87, or any other letter of credit under which said goods may have been purchased.

" And we also agree to keep such goods covered by insurance against loss or damage by fire, by policies made payable to you in case of loss or damage, and to deliver such policies to you, and to keep the same renewed and in force.    And for value received, we further agree that you may at any time enter any place where the said goods are stored, and without process of law take possession of them and store them in your name at some other place, without any

FIRST DEPARTMENT, MAY TERM, 1895.    [Vol. 87.

claim of us for trespass or damage for so doing. Without detriment to or impairment of your claim and rights to the goods themselves, such claim and rights shall also attach to the proceeds thereof, which shall, to all intents and purposes, be your absolute property until full satisfaction by payment shall have actually been made to you under the agreement of receipt of said letter of credit.

"Yours respectfully,

"E. S. WHEELER & CO."

· On the same day Wheeler, under his firm name, drew his sight draft upon the Hall & Willis Hardware Company of Kansas City, to whom he had contracted to sell the 600 boxes of tin plates for the purchase price thereof, being the sum of $3,974.46. This draft he deposited at once in defendant's bank with the invoice and bill of lading for the tin plates attached thereto, and the defendant credited Wheeler's account with a sum equal to the face value of the draft less $4.56 deducted for discount.

August thirtieth, following, the Hall & Willis Hardware Company paid the amount of said draft to the Armour Brothers' Banking Company, defendant's agents for collection at Kansas City.

Three days later defendant received from its Kansas City correspondent a draft on the Mechanics' National Bank of the city of New York, for the full amount of the draft drawn on the Hall & Willis Hardware Company, and said draft was paid to defendant by the Mechanics' National Bank September 5, 1887. On the same day Wheeler failed in business, and ever since has been insolvent. Two days later, and on September seventh, plaintiff's firm notified the defendant that they were the owners of the tin and its proceeds under and by virtue of the trust receipt, and demanded the merchandise or its proceeds, which demand was refused. The daily balances of Wheeler at the National Park Bank, from August twenty-seventh to September second, were in excess of the sum of $3,974.46, which was the face value of the draft in controversy, but on September second Wheeler's daily balance was reduced to $2,159.98. For each of the following days until after the service of the notice and demand by the plaintiff's firm upon the defendant, which occurred September seventh, Wheeler's daily balance at the defendant bank was considerably in excess of the amount of the

draft. September 8, 1887, plaintiff's firm brought suit against Wheeler, in the Superior Court of the city of New York, to recover a large amount of goods, including the 600 boxes of tin plates which were the subject of the draft in controversy, purchased by Wheeler under the letter of credit issued to him by the plaintiff's firm.

The summons was served by publication only, and Wheeler entered no appearance therein, and judgment thereafter resulted in the alternative form, for the goods or damages, and the 600 boxes of the plates were included therein.

In January, 1888, the plaintiff's firm presented to the commissioners of the estate of Wheeler in New Haven a statement of account between them and Wheeler, which included the indebtedness arising from the draft for £815, 8s. sterling, and subsequently plaintiff's firm received several dividends from such commissioners on account of such indebtedness, aggregating the sum of $665.70. Judgment went against defendant at Special Term for the amount standing to the credit of Wheeler on the books of the National Park Bank on September second, which was $2,159.98, less the sum of $665.70 received by the plaintiff's firm from the commissioners of the estate ·of Wheeler.

*Francis C. Barlow*, for the appellant.

*John K. Creevey*, for the respondent.

PARKER, J.:

Under the terms of the trust receipt the plaintiff's firm were the ·owners of the merchandise sold to the Hall & Willis Hardware Company, and were entitled to the proceeds. If the defendant had knowledge of plaintiff's firm's ownership when it received the draft from Wheeler and credited his account therewith, plaintiff's right to recover the full amount would not be questioned.

But it is not pretended that the bank had any notice at the time it discounted the draft, on August twenty-seventh, or at any time thereafter prior to September seventh, that Wheeler was not the ·owner of the tin plates, or that any trust existed in favor of the plaintiff's firm. By delivering the bill of lading and invoice to Wheeler the plaintiff's firm clothed him with the apparent authority

of an owner, which was sufficient to protect the bank in dealing with him as such, and had it paid to Wheeler the full amount of the draft at the time of the discount, an action could not have been maintained for the recovery of any part of it. And this is so, because a person having power to sell and deliver merchandise to a good faith purchaser may resort to the usual agencies for realizing the purchase money, and it follows that when such agencies advance money in good faith, and in the usual course of dealing, they are entitled to the same protection as a purchaser of the merchandise.

If, however, such agency has not parted with the moneys, or changed its position by reason of the transaction, the real owner may invoke the rule of equity, that where a person holding money in a fiduciary capacity misuses or misappropriates it, the real owner can follow it so long as he can identify it until it comes into the possession of one who in good faith parts with value for it. And where, as in this case, the party seeks to trace the proceeds of the property after it has been deposited in a bank with the individual money of the depositor, it is sufficient for the purposes of identification, and to establish the character of the proceeds as trust money, to trace them into the bank, and to show that they were there at the time notice was given of the plaintiff's rights. Upon this view the learned judge at Special Term proceeded, and finding, as he did, that at the close of the business of the second day of September, the credit balance of Wheeler at the defendant bank was $1,809.92, less the amount of the proceeds of the tin draft, he held that the defendant had to that extent made payment to Wheeler on account of the draft, but the balance of the draft, being $2,159.98, with which he had been credited by the defendant, was still in its hands. As Wheeler's credit balance with the defendant at the close of business on each of the days following, down to and including the seventh of September, was greater than the sum of $2,159.98, the court decided that to such extent the moneys of the plaintiff's firm must be held to have been in the possession of the defendant at the time the plaintiff's firm gave notice to it that the moneys belonged to them.

The rule established by the court, in reaching such result, was not to apply the first drawings out to first payments in, as in *Clayton's Case* (1 Merivale, 572), but it assumed, on the authority of *In re Hallett, Knatchbull's Case* (L. R., 13 Ch. Div. 696), that Wheeler in

drawing checks against the blended account of his individual trust funds intended to be honest, and to draw from his own funds first, leaving the trust fund intact. And thus assuming, the conclusion was necessarily reached that he drew only $1,809.92 of the trust funds. The rule in *Clayton's* case, which the defendant strongly insists is applicable to this situation, is stated by Sir WM. GRANT at page 608, as follows:

" In such a case there is no room for any other appropriation than that which arises from the order in which the receipts and payments take place and are carried into the account. Presumably, it is the sum first paid in that is first drawn out. It is the first item on the debit side of the account that is discharged, or reduced by the first item on the credit side    The appropriation is made by the very act of setting the two items against each other. Upon that principle all accounts current are settled, and particularly cash accounts When there has been a continuation of dealings, in what way can it be ascertained whether the specific balance due on a given day has, or has not, been discharged, but by examining whether payments to the amount of that balance appear by the account to have been made?"

If that rule without modification should have been adopted by the trial court the defendant would have been entitled to judgment. At the opening of business August twenty-fourth Wheeler's balance was $10,899.39. Adding to this balance the other credit items down to and including the deposit of the draft in question on August twenty-seventh, Wheeler's aggregate credits were $58,962.54.

The rule in *Clayton's* case would seem to be that the first debit items in the account must be treated as drawn against this credit aggregate.

But the aggregate of the debit items from the beginning down to the close of business August twenty-ninth, nine days before the notice to the defendant by the plaintiff, was $62,314.58, being an excess of debit items over the aggregate of credits of $3,352.04.

We have been favored with an interesting and forceful argument by the appellant intended to make it clear that the rule in *Clayton's* case, which antedates that of *Knatchbull's* case, and which has prevailed for many years, should apply to this situation rather than the rule of the latter case.

(1) Because it is said *Knatchbull's* case is not good law. This fact it is claimed is evidenced by a long line of authorities in England, extending over many years, which apply the rule in *Clayton's* case to the facts which appear in *Knatchbull's* case, as well as by the decisions of a court of co-ordinate jurisdiction in *Pennell* v. *Deffell* (4 De G., M. & G. 372).

(2) That if it be good law the facts in that case and the one at bar differ so radically as to the point upon which *Knatchbull's* case went as to prevent its being considered applicable. In support of the latter proposition attention is called to the opinions in *Knatchbull's* case, in which the rule in *Clayton's* case was assumed to be the general rule, the exception being where there are circumstances sufficient to create a presumption that the depositor did not intend his first checks to be paid out of his first deposit. The trustee in that case, in drawing moneys out of the blended account, never reduced his balance below the amount of the trust moneys paid in, and the judges were of the opinion that the trustee should be presumed to have been honest and not dishonest, and, therefore, he could not have had any other intention than that of appropriating his drawings to his own private moneys, so as to leave the trust moneys intact.

Thus, it is contended the presumption which arose in *Clayton's* case was rebutted in *Knatchbull's* case by the presumption of the honesty of the trustee.

But in the case at bar the presumption in *Knatchbull's* case does not arise, because on the very day that Wheeler deposited the draft he drew out $195.13 of it, and afterwards made further drafts by which still larger sums were drawn out.

Hence it is urged that the facts upon which *Knatchbull's* case went were not present, and this case should be remitted to the rule of *Clayton's* case.

Were we at liberty to regard this question as an open one in this State, we should feel called upon to carefully consider the arguments, which we have merely suggested, but it seems to us that the question now presented was passed upon in *Importers & Traders' National Bank* v. *Peters* (123 N. Y. 272). In that case the court said that where a person holding money " in a fiduciary capacity pays it to his account at his bankers, and mixes it with his own money,

and afterwards draws out some by checks generally and in the ordinary manner, the drawer of the checks must be taken to have drawn out his own in preference to the trust money. The rule attributing the first drawing out to the first payment in does not apply to such a case."

The conclusion being reached that there was in the hands of the defendant a sum of money belonging to the plaintiff's firm on the seventh day of September, when notice of plaintiff's right thereto was given to the defendant, it would seem unnecessary to cite authorities in support of the proposition that the defendant cannot set off as against such balance an unmatured claim held by it at that time against Wheeler. Three days later a draft, which had been discounted by the defendant for the benefit of Wheeler, matured and was not paid, and thereafter during the two following months several drafts, upon which Wheeler was liable, matured, but all of this paper was discounted prior to the deposit of the draft which occasions this controversy, and, therefore, it in nowise influenced the defendant to discount the paper which it now seeks to set off.

As to such paper the defendant's position was neither changed nor affected by the discount of the tin draft, and, therefore, it is not entitled to set off such claims as against money in its hands belonging to the plaintiff's firm, but credited to Wheeler, even though it should be conceded that it would have had that right as against Wheeler had such balance belonged to him instead of plaintiff's firm. Nor does the defendant's claim seem to be well founded that the plaintiff cannot recover such portion of the money as it is found was in the defendant's possession on the seventh of September, because the defendant has a banker's lien upon the balance to the credit of Wheeler's account. It is not claimed that Wheeler by any formal act applied the proceeds of the draft to the payment or security of the unmatured paper, or that there was any agreement or understanding between Wheeler and the defendant to that effect.

Defendant's claim of lien, therefore, is founded solely on its claim that it had a right to apply the proceeds remaining in its hands to the credit of Wheeler on the seventh of September as security for the unmatured paper which it had discounted at the instance and request of Wheeler.

This proposition was met and decided adversely to the appellant's

present contention in *Jordan* v. *National Shoe & Leather Bank of the City of New York* (74 N. Y. 467). It was there held that, in the absence of a contract between the depositor and the bank, the latter has not a right to retain the balance of a customer's deposit to pay or apply upon an indebtedness of a customer to the bank not yet matured, and, so far as we have observed, the authority of this case has in nowise been shaken or modified by subsequent decision.

The appellant further insists that the doctrine of election between inconsistent remedies should have prevented a recovery by the plaintiff.

*Morris* v. *Rexford* (18 N. Y. 555), *Greton* v. *Smith* (33 id. 245), *Bank of Beloit* v. *Beale* (34 id. 473) and other cases are cited in support of the proposition that where there are two absolutely inconsistent remedies, the party is not entitled to enforce both, and the election of one precludes a resort to the other.

An election once made is determined forever. (*Moller* v. *Tuska*, 87 N. Y. 166.) It may be determined by any decisive act made with full knowledge of all the facts (*Fowler* v. *Bowery Savings Bank*, 113 N. Y. 450); and the bringing of an action to enforce one of the remedies sufficiently evidences an election. (*Conrow* v. *Little*, 115 N. Y. 387.)

Now, the acts of plaintiff's firm, which defendant insists establishes satisfactorily and conclusively that between two inconsistent remedies the plaintiff's firm made an election prior to the commencement of this action, are, briefly, that on September 8, 1887, the day following the giving of the notice to the defendant bank, plaintiff's firm commenced an action, in the Superior Court of the city of New York, against Wheeler to recover possession of a large amount of property, including the 600 boxes of tin, the proceeds of which are now in dispute.

The appellant says that this action went upon the theory that the tin was the property of Wheeler and in affirmance of his ownership of the draft, and thus inconsistent with the claim that the proceeds of the tin are the plaintiff's property, upon which theory this action proceeds. But the appellant seems to us to be inaccurate in this position. An examination of the complaint makes it clear that the action was brought upon the theory that plaintiff's firm were the owners of the tin and entitled to the possession of it.

Both that action and this alleged Wheeler's indebtedness to plaintiff's firm; that the 600 boxes of tin were the absolute property of plaintiff's firm, and would so continue until full satisfaction by payment should be actually made under the trust receipt.

The other fact relied upon to establish an election is, that plaintiff's firm, with full knowledge of the misuse of the draft in question, and before the commencement of this action, presented to the commissioners of Wheeler's estate in the State of Connecticut, who had been appointed to pass upon the claims against said estate, proof of a claim against Wheeler, under which dividends were afterwards paid to the plaintiff's firm aggregating $665.70. It may be said in passing that this sum was deducted from the amount of the draft, in addition to the deduction already spoken of, made because to that extent the fund had been drawn out of the bank. The deduction was made by the trial court because it felt constrained to do so, owing to a stipulation contained in the record.

This ruling of the court is not challenged and need not be further alluded to.

Now, it is urged that plaintiff's firm on the seventh of September had two remedies, either one of which they could resort to, but not both, because they were inconsistent. These remedies were : *First,* to treat the 600 boxes of tin as plaintiff's property and follow it or the proceeds. *Second,* to ratify the action of Wheeler in selling the property and treating the proceeds as his own, and proceed against him for the purchase price.

The case of *Bank of Beloit* v. *Beale* (34 N. Y. 473) is especially invoked, because of the alleged similarity of its facts to the case at bar. In that case a vendor, who was defrauded in the sale of goods, after being apprised of the fraud took judgment against his vendee under the contract of sale, and when afterwards he attempted to follow the goods or proceeds into the hands of third persons on the ground that the goods were obtained from him through fraud, the court held that he had made his election to affirm the contract, and could not, therefore, proceed in disaffirmance of it. But it will be observed that the vendor's position in one action was that he had made a valid contract with the vendee under which delivery of the goods had been made which entitled him to recover the purchase

price, while in the other it was that the alleged contract between himself and the vendee was absolutely void, and no contract at all, because of the fraud of the vendee.

In other words, to maintain one action it was necessary to prove a contract, and to maintain the other that there was no valid contract. If the circumstances surrounding the transaction out of which this action grows presented a similar situation, the appellant's position would be well founded. But here every step which has been taken, whether in the action in the Superior Court, in the presentation of claims against the estate of Wheeler, or in the commencement of this action, is in affirmance of the contract between plaintiff's firm and Wheeler. It presents a case where plaintiff's firm has two or more consistent, instead of two or more inconsistent remedies. And a party, having several remedies for the same debt, may resort to them all, although he can have but one satisfaction. (*Gambling* v. *Haight,* 59 N. Y. 354.)

In the contract or trust receipt, as it is called, between Wheeler and the plaintiff's firm, it was provided that the goods purchased under the letter of credit, and the proceeds, " shall, to all intents and purposes, be your absolute property until full satisfaction by payment shall have actually been made to you under the agreement of receipt of said letter of credit." This was in furtherance of the original trust agreement, signed by Wheeler & Co., upon receiving the letter of credit for £10,000 sterling.

Therein Wheeler agrees " To provide you here fifteen (15) days before the maturity, respectively, of any bills drawn under such letter of credit, with sufficient funds in the currency of the United States to meet such bills as they become due, together with your commission upon the amount of such bills, which it is agreed shall be one-half of one per cent ($\frac{1}{2}$ %). We also agree to give you security here for the amount of such bills at any time previous to their maturity if required by you to do so. All property which shall be purchased by means of the above credit and the proceeds thereof and the policies of insurance thereon　*　*　*　are hereby pledged and hypothecated to you as collateral security for the fulfillment of this. agreement on our part."

By the contract then it was provided that the ownership of the merchandise and the proceeds thereof should continue in the plain-

tiff's firm until Wheeler should pay to them the original purchase price. Its legal effect was to make Wheeler the debtor of plaintiff's firm for the moneys advanced in payment of the merchandise purchased by him, and plaintiff's firm the owners of the goods until full payment should be made. (*Moo.'s* v. *Kidder*, 106 N. Y. 32; *Drexel* v. *Pease*, 133 id. 129–136.)

Under their contract, therefore, plaintiff's firm had the right to sue Wheeler for his debt, and in the same or another action enforce their rights as owners of the goods.

The judgment should be affirmed, with costs.

VAN BRUNT, P. J., and FOLLETT, J., concurred.

Judgment affirmed, with costs.