## KING v. COOMBS.

No. 1185.    Opinion Filed September 28, 1911.

Rehearing Denied December 21, 1912.

(122 Pac. 181.)

1.    MINES AND MINERALS—Mining Lease—Assignment. Where a person knowing of lands upon which an oil and gas mining lease can be obtained, and knowing the price at which he can obtain it, offers to sell it to another at a fixed sum, which offer is accepted by the other, and he then procures the lease, the transac-

tion is not one of agency, and the person offering the lease occupies the position of an assignor of the lease, though the lease is made direct from the landowner to the person to whom he has offered to sell it.

2. **LANDLORD AND TENANT—Sale of Lease—Covenant for Quiet Enjoyment.** Where a party prices a lease to another at a. fixed sum, without any agreement as to what covenants the lease should contain, the law will imply a covenant by him that the lease will be one under which the lessee can enter upon and hold the property during the term contained in the lease.

3. **SAME—Recovery of Price.** Where a party contracts to sell another a lease at a fixed sum, and procures the lease direct from the supposed allottee to the person with whom he contracts, he cannot recover the price, where there was at the time of the delivery of the lease a contest threatened, as to the lands described in the lease, which was afterwards instituted and in which the contestants prevailed, and in which the allotment of the lessor was canceled.

(Syllabus by Rosser, C.)

*Error from District Court, Washington County;*
*T. L. Brown, Judge.*

Action by John Coombs against R. N. King. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

*Veasey & Rowland, W. H. Kornegay,* and *W. A. Sipes,* for plaintiff in error. ,

*H. H. Montgomery, J. J. Shea,* and *J. P. O'Meara,* for defendant in error.

Opinion by ROSSER, C. In this case the defendant in error, John Coombs, hereinafter called plaintiff, brought this action against the plaintiff in error, R. N. King, hereinafter called defendant, to recover the sum of $847, which he alleges was due him for services in obtaining an oil and gas mining lease covering the lands of Mrs. Bushyhead, in the Cherokee Nation. From the case-made it appears that the plaintiff was engaged in taking oil and gas leases on lands in the Cherokee Nation, and that the defendant told plaintiff he understood plaintiff was taking some leases; that the plaintiff spoke to defendant about the land concerning which this controversy arose, and defendant told plaintiff he would like to have it; that plaintiff told defendant

he could get the lease for $11 per acre, and defendant said he would examine the records and notify plaintiff through Mr. Murray, his agent. Plaintiff also promised to examine the records. A short time afterwards plaintiff received a letter from Mr. Murray, as follows:

"I send you under separate cover blank leases, with company's name printed in, affidavit and other papers. Be careful and see that everything is O. K."

Accompanying this letter was the lease, or leases, already filled in with the description of the land. On the same day the plaintiff received a telegram from Murray as follows:

"Will take lease. Await instructions. Affidavit and papers mailed today."

After receiving this telegram and letter, plaintiff obtained the lease from Bushyhead, expending in the course of obtaining it, according to his testimony, a little over $400. He then took the instrument, and delivered it to the defendant at Bartlesville. When the lease was delivered to the defendant, he stated to the plaintiff that they would go and see defendant's attorneys, and let them pass on it. They went together to see Mr. Veasey, who was the attorney for the defendant, and Mr. Veasey said he was afraid that they would have trouble over it, and advised the defendant not to accept the lease and pay for it, and defendant declined to pay for it. Defendant or his attorney, however, kept the instrument.

It is admitted that the lease was in proper form, and complied with the regulations of the Secretary of the Interior as to all matters of formality. The lease was afterwards filed with the Commission to the Five Civilized Tribes at Muskogee. The defendant and his attorney, Veasey, testify that it was filed by a stenographer in Veasey's office, contrary to the order of both defendant and his attorney. It was never returned to either party and was never approved by the Interior Department. The defendant denies having employed the plaintiff to obtain a lease, and alleges that he agreed to accept an oil and gas lease on certain lands described in his answer, which are admitted to have been the same lands as that covered in the lease taken, but says

that the agreement was that the lease should be in such condition that it would convey good title, and that the title would be without question. He states, further, that Tate Brady was contesting the right of Bushyhead to the lands described in the lease, and that that contest was pending at the time of the filing of the answer. It is agreed that the contest was tried before the trial in this case, and that the contestants, the children of W. T. and R. C. Brady, prevailed in the contest, that Mrs. Bushyhead's filing was canceled, and that the certificate of allotment was issued to the Brady children.

In arriving at a decision in this case, it becomes necessary to determine what the actual contract between the plaintiff and defendant was. If the defendant employed the plaintiff as his agent to go and get this lease on this particular land from Mrs. Bushyhead, taking the risk of the title himself, and not placing any burden upon the plaintiff to ascertain whether or not the title was good, then the judgment of the court below is correct. If, however, the agreement was to sell to the defendant the lease upon the land, then, in the absence of express agreement as to what the covenants of the lease would be, the law would imply a warranty of title to the land in controversy for the term of the lease. In ascertaining what the contract actually was, it will be necessary to set out a portion of the testimony verbatim.

The plaintiff, after stating that he was introduced to the defendant by Mr. Murray, said:

"And he said he understood I was taking some leases, and this lease I spoke to him about, down close to Tulsa. He said he would like to have the lease, and I told him that I could get the lease for—could get it for $11 an acre, and he said he would like to have the lease, and said he would take the lease. He would go back and examine the records, and he would notify me through Mr. Murray, his agent, and I got a letter and telegram from Mr. Murray saying to take the lease."

The plaintiff then produced the telegram and letter referred to in his testimony. He testified then to having taken the lease, and to the amount that he paid for it, and then says that he took the instrument of lease to the defendant. The examination proceeds as follows:

"Q. Did you have any further conversation about it with Mr. King, then? A. Yes; he was at the Almeda Hotel, and I went there to give him the lease, and he said, 'We'll go over and see my attorneys and let them pass on it.' So he went over to see Mr. Veasey, and when he got there, Mr. Veasey said he was afraid they would have trouble on it, and they wouldn't take it, but they kept the lease."

In his cross-examination he was asked:

"Q. How did you find out that Mr. King wanted the lease? A. Well, he asked me if I had anything, any good leases, and I showed him this. I told him about this lease that had been ·offered to me, and he looked the matter over and he said he would like to have the lease. Q. Who was it that had offered you the lease on these grounds? A. Well, there was a man by the name of Byrd that filed this woman. Q. Did you communicate to Mr. King the offer that Mr. Byrd had made to you, ·or did you say anything about that? A. I didn't say anything about that. Q. How did you and Mr. King arrive at the price of $11 an acre? A. I just told him how much I wanted for the lease. Q. And you told him you wanted $11 an acre? A. Yes, sir. Q. What do you mean by $11 an acre? Now what was the idea that you had when you told him you wanted $11 an acre for the lease? A. Well, you know that leases have a price on them, and I just priced this land at $11 an acre. Q. Well, was he to get the oil that was in the ground just for $11 an acre? A. No, sir; he was to pay a bonus, that was the bonus part."

He then goes on to tell what he would make on it after taking out his expenses, and explains that it would have been something about $400 for his trouble. Then the examination proceeds:

"Q. You never made any account of that in dealing with Mr. King, you just said $11 an acre? A. Well, it was customary for people to price the lease. Sometimes they made a small profit on them."

The witness then makes his statement with reference to the amount paid Mrs. Bushyhead for the lease. He explains that it was made through one Mr. Byrd, and that Byrd was her administrator, and that she agreed for him to take part of the money paid and that she get part of it. The examination then proceeds:

"Q. Well, in what way was he her administrator, by what power of appointment? A. Well, he had taken care of her, and he had his papers. Q. Had he actually filed her on the land? A. Yes, sir; he had actually filed her on the land. Q. Mr. Coombs, how do you know that he had filed her on that land? A. Well, I went over there and examined the records myself. Q. When did you do that? A. I went over there just the day before I went to take this lease. I told Mr. King that I would go over and examine the records, and see if there was anything against it. Q. Did you examine the records in person? A. I did. I went over there and asked the people that were in charge of the commission if there was anything against this land, and if it was straight."

Further in the cross-examination occurs the following:

"Q. Well, how did you know that you could get this lease so you could make a profit, Mr. Coombs, when did you find that out? A. I found it out after I went down there to buy it. Mr. Byrd said what I could buy it at. Q. Well, when was that? That is what I want to know. A. That was before I met Mr. King."

Further in the examination:

"Q. Did you deliver to him the lease in the Almeda Hotel, or rather the papers signed by the allottee? A. I think I told him that I had it, but I think I told him on the way from the hotel to Mr. Veasey's office. Q. When was it he was telling you that Brady was claiming this land? A. I told him on the way between the Almeda Hotel and Veasey's office. Q. When had you heard of it before? A. I hadn't heard of it before. Q. Byrd hadn't told you anything like that? A. I didn't know there was a man like Brady. Q. Had you ever seen the land before you got the lease on it? A. I never had, only the map, I had seen it on the map. Q. All of you were examining and going by the map—the oil map—a good deal, weren't you? A. Yes; a good deal. Bought and sold leases by the map altogether. Q. Now, Mr. Coombs, when he told you that Mr. Brady was claiming it, what did you tell him? A. I told him that was news to me. I never heard of it. The only way that he had, of course, was to go to the record, and see if there was any leases. All of them were sold that way. Q. Now, Mr. Coombs, after you found out that he was setting up the fact that Mr. Brady was claiming this land, what did you do about it? A. I had nothing to do about it. I had sold this stuff. It was a trade by him and me. He had examined and passed on it, and I had examined it.

I saw nothing against it. He met up with Brady and him and Brady had this talk, and that's what scared him off."

While the plaintiff alleges that he was employed to procure this lease, and appears to be relying upon a contract of employment for his services as agent in procuring this lease, his testimony in the case shows that he was selling the lease to the defendant. He says that the $11 an acre was a bonus that was to be paid him for the land, and also that it was a trade between him and the defendant. It is not claimed that he was to receive a stipulated sum for his services, and his expenses in addition, in the way agents are ordinarily paid, and while this is not conclusive of itself, still the fact that he rendered no account of his expenses, and said nothing in regard to that, but priced the land at so much per acre, is a circumstance tending to show that it was a contract of sale, and not one of agency. He says that all leases were sold that way.

In *Black v. Webb*, 20 Ohio, 304, 55 Am. Dec. 456, Webb sued Black for breach of the following agreement:

"Received $175.00 to buy barley for William Webb, for which I agree to deliver 1000 bushels of barley to Mr. Reynold's warehouse in Massilon, at 35c per bushel, by the middle of April, next. The said barley to be good, merchantable barley. John Black."

After entering into this agreement, Black purchased barley and up to the 22d of February, 1847, had stored in Reynold's storehouse over 600 bushels. On that date the barley was ruined by a flood. Black afterwards purchased enough barley to make, with that washed away by the flood, 1,000 bushels, and on the 15th of April tendered Webb the warehouse receipts for that washed away and the barley on hand, and which was refused by Webb. He was willing, however, to accept the barley on hand as so much on account. It was also shown at the trial that Webb would often go to Black's store and examine the barley, and on one occasion condemned a load as of poor quality. Webb obtained a verdict and Black took an appeal. The question involved in the case was whether Black was the agent of Webb in purchasing and storing the barley at Massilon, or was he the vendor

of 1,000 bushels of barley to Webb to be delivered at a given time, at a certain place, and for a stipulated price. If an agent, the law would cause the loss to be upon the principal. If, however, he was the vendor of the barley, Webb was entitled to recover. The court held that the facts constituted a contract of purchase and sale, and not an agreement constituting an agency. In the course of the opinion, Spaulding, Justice, said:

"Now it made no manner of difference with William Webb whether the price of barley rose or fell in the market between the 7th day of February and the 15th day of April, 1847. He was sure of 1,000 bushels at the price of 35 cents per bushel, and, peradventure, it might have cost John Black 50 cents per bushel before the day of delivery arrived. There is nothing characteristic of an agency in this."

In this case it made no difference to King what price Coombs paid for the lease. He was to receive it at $11 an acre. See, also, *Kelley-Maus Co. v. Sibley,* 137 Fed. 586, 69 C. C. A. 674; *Moors v. Kidder,* 106 N. Y. 32, 12 N. E. 818. It also appears from his testimony that while the defendant examined the record, the plaintiff also examined the records, and it also appears that, when the defendant started to his attorney to have him pass on the lease, the plaintiff made no objection, and apparently did not consider that he was entitled to his money until the lease was examined by the attorney, and passed upon.

All these circumstances taken together indicate that he was merely selling the lease, and not acting as the agent of the defendant. The money that he was to receive was the price of the lease. In fact, the word "bonus," as used by the plaintiff, means a part of the price. See *Leslie v. Leslie,* 50 N. J. Eq. 112, 24 Atl. 319.

In every lease contract there is an implied covenant for quiet enjoyment during the term of the lease, at least as against the lessor or any one claiming by superior title. *Hanley v. Banks,* 6 Okla. 79, 51 Pac. 664; *Wade v. Halligan,* 16 Ill. 507; *Berrington v. Casey,* 78 Ill. 317. There is an implied covenant in every lease contract that the lessor will deliver the possession of the premises at the beginning of the term. *Sloan v. Hart,* 150 N. C. 269, 63 S. E. 103, 21 L. R. A. (N. S.) 239, 134 Am. St. Rep.

911. Mrs. Bushyhead had no title to the land, and therefore she could not have given a valid lease thereon, and she could not have collected from the defendant the consideration stipulated for in the lease contract. The bonus of plaintiff being part of the price, he could not collect it for the simple reason that there was no consideration delivered by him. He had not done what he had either expressly or impliedly agreed to do. The defendant testified that plaintiff expressly agreed to deliver a lease on the land free from any claim by Brady, but it makes no difference whether he expressly agreed to do so or not.

From the facts as testified to by the plaintiff, the law implies a covenant that the defendant would receive a lease which he could hold and enjoy for the term stated, and, when he ascertained that he could not do so, he was justified in declining to pay the "bonus" he had agreed to pay plaintiff. It is not reasonable to presume that a person will enter into a lease contract for a term when he would be unable to hold the property leased for and during the term. The case of *Norton v. Stroud State Bank,* 17 Okla. 295, 87 Pac. 848, cited by defendant in error, is not in point. That was a case where the lease was assigned by the lessee to Albert and F. A. Norton, the assignment being restricted to the right, title, and interest of the assignor, and they, in consideration of the terms of the lease, executed their note for $150 to Lynch, and Lynch transferred the note to the plaintiff as collateral security for the money which Lynch owed plaintiff. The assignees of the lease entered into possession of the land, used and occupied it, and the court held that, under the circumstances, the assignees could not defeat the payment of the note by showing the invalidity of the lease. In the case of *Hanley v. Banks,* 6 Okla. 79, 51 Pac. 664, the rule is broadly stated that in every lease contract there is an implied covenant for quiet enjoyment. Even in contracts to convey there is an implied covenant that the grantor will convey a good title. *Turner v. Ogden,* 1 Black, 450, 17 L. Ed. 203; *Moore v. Williams,* 115 N. Y. 586, 22 N. E. 233, 5 L. R. A. 654, 12 Am. St. Rep. 844. The same rule does not apply with reference to deeds, because a deed is the completed

contract and final expression of the parties, and is supposed to contain all the terms and conditions of the contract.

The plaintiff, having agreed to sell this lease to the defendant, impliedly agreed that the lease would be such that the defendant would have the right to enter upon the land and occupy the same during the 15-year term, so far as it was necessary to drill for oil and gas, and to remove whatever oil or gas was found thereon from the land. And the fact that the lease was made directly from Mrs. Bushyhead to the defendant did not affect the contract between the plaintiff and defendant, and did not relieve him of the covenants which the law would imply had he taken the lease from Mrs. Bushyhead and then executed a sublease. Unquestionably the contract was made direct, for the very purpose of evading the regulations of the Secretary of the Interior, which prohibits the assigning or subletting without his consent.

With this view of the case, it is not necessary to consider the other assignments of error.

The judgment, therefore, should be reversed, with instructions to dismiss the plaintiff's petition.

By the Court: It is so ordered.