JOSEPH B. MOORS, Appellant, *v.* HENRY P. KIDDER et. al., Respondents.

Where a commercial correspondent advances his own money or credit for the purchase of property and takes the bill of lading in his own name, looking to the property as the means of reimbursement, he becomes the owner instead of a pledgee, and so remains until the mover in the transaction pays the purchase-price, and his relation to the latter is that of an owner under a contract to sell and deliver when the purchase-price is paid.

S. and B. Bros. & Co. entered into an agreement, in pursuance of which the latter issued a letter of credit to B. & Co., of Calcutta, authorizing that firm to value on B. Bros. & Co. by bills for an amount specified, and promising to accept and pay the bills if accompanied by bills of lading filled up to the order of B. Bros. & Co., and by invoice to their order. S. agreed to provide funds in London to meet the bills at maturity. The agreement further stated that all property purchased by means of such credit, together with the bills of lading for the same, were thereby pledged and hypothecated to B. Bros. & Co. as collateral security for such payment, to be "held subject to their order on demand, with authority to take possession and dispose of the same at their discretion for their security and reimbursement." Against the credit of said letter B. & Co. drew their bill of exchange for the cost of 100 cases of shellac, and attached it to a bill of lading for the shellac running to the order of B. Bros. & Co., who accepted the bill of exchange and paid it at maturity. *Held* that B. Bros. & Co. were owners of the property.

In the ordinary course of business the shellac was brought to the custom house in New York and into the "general order" stores. On application of S. the papers were indorsed in blank and delivered to him by B. Bros. & Co., for the sole purpose of enabling him "to enter them at custom house, and warehouse them for account of" B. Bros. & Co.; S., instead of doing this, entered the shellac in the name of his broker, obtained a warehouse receipt, and then pledged the property to plaintiff

as security for a loan, the latter relying upon the representations of S. and the ware house receipt. *Held,* that plaintiff acquired no title to the property; and that an action to recover possession thereof was not maintainable.

(Argued March 25, 1887; decided June 7, 1887.)

APPEAL from judgment of the General Term of the Supreme Court, in the first judicial department, entered upon an order made January 28, 1885, which affirmed a judgment in favor of defendants entered upon an order dismissing the complaint on trial, and affirming an order denying a motion for a new trial. (Reported below, 34 Hun, 534.)

The action was brought against the members of the firm of Kidder, Peabody & Co., Baring Brothers & Co. and John B. Hobby, Sons & Co. to recover possession of 95 cases of shellac. Kidder, Peabody & Co. were bankers in Boston and agents of Baring Brothers & Co. John H. Hobby, Sons & Co. were warehousemen in New York.

On August 3, 1881, Kidder, Peabody & Co., as such agents, under an agreement with Paul M. Swain, issued a letter of credit, which was confirmed by their principals. The following are copies of the material portions of said instruments:

"KIDDER, PEABODY & CO.,
  "40 STATE STREET,
  "BOSTON, *August* 3, 1881.

" MESSRS. C. C. BANCROFT & Co., Calcutta.

"DEAR SIRS. — You are hereby authorized to value on Messrs. Baring Bros. & Co., London, for account of Paul M. Swain, Esq., Boston, Mass., by bills at three (3) months sight for the cost of any shipment of goods via San Francisco and thence overland, or at three (3) to six (6) months sight for the cost of goods by any other route, direct, or under through bills of lading to Boston or New York, to the extent of three thousand pounds sterling (say £3,000 stg.), and we hereby agree with the drawers, endorsers and *bona fide* holders respectively of the bills drawn by virtue of this credit that the same shall be duly honored by Messrs. Baring Bros. &

Co., upon presentation at their banking house in London, if drawn and negotiated within six (6) months from this date, and if accompanied by bills of lading for such goods filled up to the order of Messrs. Baring Bros. & Co., and by invoice of the same to their order for the account of whom it may concern.

"A duplicate of such invoices with consular certificate attached, together with one bill of lading, to be sent direct to us either by vessel or mail.

"Very respectfully,

"Your obedient servants,

"KIDDER, PEABODY & CO.,

"Boston, *August* 3, 1881.

"Received the original of within letter of credit for three thousand pound sterling (say £3,000 stg.). In consideration whereof and of its confirmation by Messrs. Baring Bros. & Co., I hereby agree with Messrs. Baring Bros. & Co. and Messrs. Kidder, Peabody & Co., respectively, to provide in London sufficient funds to meet the payment at maturity of whatever bills may be drawn or negotiated by virtue of such credit, together with Messrs. Baring Bros. & Co., commission upon the amount of such bills. * * * And all property which shall be purchased by means of the within credit and the proceeds thereof and the policies of insurance thereon (which insurance to the amount of the value of such property we agree shall be duly effected), together with the bills of lading for the same are hereby pledged and hypothecated to Messrs. Baring Bros. & Co., as collateral security for the payment as above promised, and also of any other sums which may at the time being be owing by us to Messrs. Baring Bros. & Co., and shall be held subject to their order on demand with authority to take possession and dispose of the same at discretion for their security or reimbursement and so to take possession and dispose of the same, either by themselves or their agents or by Messrs. Peabody, Kidder & Co." * * *

    (Signed)                      PAUL M. SWAIN.

Against the said credit C. C. Bancroft & Co., drew their bill of exchange for account of Swain, for the cost of a hundred cases of shellac, of which the property in controversy is a part, and attached it to a bill of lading for the shellac to the order of Messrs. Baring Bros. & Co., deliverable in New York. Baring Bros. & Co., accepted said bill of exchange and paid it at maturity.

On the eighteenth of November, Swain called at the office of Kidder, Peabody & Co., in Boston, and asked for the papers for the shellac, stating to Mr. Collins, the merchandise clerk for Kidder, Peabody & Co., that "he wanted to enter them at the custom-house and warehouse them for account of Baring Bros. & Co." Mr. Collins having obtained Mr. Peabody's consent, delivered the shipping papers to Swain, and received the following receipt and agreement in exchange for them:

" BOSTON, *November* 18, 1881

To Messrs. KIDDER, PEABODY & Co., Boston :

GENTLEMEN. -- I acknowledge receipt from you, as attorneys for Messrs. Baring Bros. & Co., of invoice and bill of lading of

New York, one hundred (100) cases
shellac,
Rs. 15,678$\frac{5}{6}$

Shipped by C. C. Bancroft & Co., on board S. S. C/o "Manchester," at Calcutta, and consigned to the order of Messrs. Baring Bros. & Co., and indorsed by you, as their attorneys, to me. Such invoice and bill of lading are delivered to me for the purpose of enabling me to enter the goods referred to in them at the custom-house.

And I hereby agree to place the goods on storage for Messrs. Baring Bros. & Co., and subject to their order, and so that they may be applied to the due performance of the agreement contained in the receipt signed by me for your letter of credit on them, No. 2419, or any other letter of credit on them, through which such goods have been purchased, we agreeing to keep them covered by insurance against

fire for account of and loss payable to Messrs. Baring Bros. & Co.

It is understood that the said goods are to be warehoused in the name of Messrs. Baring Bros. & Co., and warehouse receipts therefor handed to you for them.

Very respectfully,

Your obedient servant,

(Signed.)          PAUL M. SWAIN."

Instead of doing as so agreed, upon receiving the shipping papers, Swain entered these goods in the name of Wm. A. Brown & Co., his brokers, who obtained a certificate that they had made due entry of the shellac according to law, the goods being free from duty; and a permit was given to land the same.

On the nineteenth of November, Swain made application to plaintiff for a loan of $6,000, and offered in his application to give as security among other things, ninety-five cases of the shellac, which he represented that he owned and would give a warehouse receipt for. The application, was accepted and a portion of the loan made on that day on other collaterals.

On the twenty-first, Swain gave an order on W. C. Casey, with whom the shellac was stored in New York, requesting him to deliver to the order of plaintiff, the ninety-five cases of shellac, and on the twenty-second he forwarded that order, with a letter to Casey, asking him to send a non-negotiable receipt to plaintiff's order. A receipt was sent as requested; on delivery of this to plaintiff, the balance of the sum loaned was advanced.

Further facts appear in the opinion.

*Edmund Randolph Robinson,* for appellant. The agreement must control, as expressing the intent of the parties and the legal effect of the transaction in creating the relation of pledgor and pledgee between Swain and Baring Bros. & Co., with respect to the goods in question. (*Haskins* v. *Paterson,* 1 Edm. S. Cas. 123.) Pledgees can only retain their lien by retaining possession, and when they deliver up possession to the pledgor, their lien ceases as against subsequent *bona fide* pur-

chasers and pledgees from him. (Shouler on Bailments, 188; *McFarland* v. *Wheeler*, 26 Wend. 472–474; *Bigelow* v. *Heaton*, 6 Hill, 43; *Black* v. *Bogert*, 65 N. Y. 601; *R. R. Co.* v. *Sage*, 35 Hun, 95; *Hazard* v. *Fiske*, 83 N. Y. 293; *Casey* v. *Cavoroc*, 96 U. S. 467; *Barrett* v. *Cole*, 4 Jones Law [N. C.], 40; *Smith* v. *Sasser*, id. 43; *Bodenheimer* v. *Newson*, 5 id 107; *Way* v. *Davidson*, 12 Gray, 465, 467: *Kimball* v. *Hildreth*, 8 Allen, 167; *Thompson* v. *Dolliver*, 132 Mass. 103; *Russell* v *Fillmore*, 15 Vt. 135; *Eastman* v. *Avery*, 23 Me. 248, *Beeman* v. *Lawton*, 37 id. 543; *Day* v. *Swift*, 48 id. 368; *Collins* v. *Buck*, 63 id. 459; *Shaw* v. *Wilshire*, 65 id. 485; *Cooper* v. *Ray*, 47 Ill. 53; 2 R. S. 135, § 5; id. 137, § 4; *Smith* v. *Acker*, 23 Wend. 653.)   An agreement between the pledgee and general owner, even though made with entire good faith, which stipulates that the pledge is surrendered to the owner for a special purpose, and is to be restored to the pledgee when that special purpose is accomplished, does not protect his lien against the title of a purchaser or subsequent pledgee from the owner, while in possession, who had neither actual or constructive notice of the agreement. (*Bodenheimer* v *Newson*, 5 Jones [N. C.], 107; *Way* v. *Davidson*, 12 Gray, 465, 467; *Geddes* v. *Bennett*, 6 La. An 516; *McFarland* v *Wheeler*, 26 Wend. 467; *Pease* v. *Gloahec*, L. R., 1 P. C. App. 219; *Smith* v. *Lynes*, 5 N. Y 41; *Wait* v. *Green*, 36 id 556; *Durbrow* v. *McDonald*, 5 Bosw. 130; *Crang* v. *Marsh*, 5 Daly, 61; *Rawls* v. *Deshler*, 4 Abb. Ct. App. Dec. 12) The statute against fraudulent conveyances creates in favor of *bona fide* purchasers a presumption against the good faith of every assignment of goods and chattels which is not followed by actual and continued change of possession. (*Smith* v. *Acker*, 23 Wend. 653; *Parshall* v *Eggert*, 54 N. Y. 18; *Tilson* v. *Terwilliger*, 56 id. 273; Jones on Pledges, § 42; *Look* v. *Comstock*, 15 Wend. 244; *Hazard* v *Fiske*, 83 N. Y. 287.) The plaintiff's title was valid under the factor's act, even if the defendants, Baring Bros. & Co. are to be treated as the general owners of the shellac, and Swain merely as their agent. (Chap. 179, § 3, Laws of

Statement of case.

1830; 4 Edm. St. 461; Public Stat. of Mass. [Ed. 1882], 417, chap. 71; *Cook* v. *Beal*, 1 Bosw. 497; *Pegram* v. *Carson*, 10 id. 505; *Cartwright* v. *Wilmerding*, 24 N. Y. 521; *Bank* v. *Gardner*, 15 Gray, 362, 372, 374; *Stollenwerk* v. *Thatcher*, 115 Mass. 224.) It is competent to show by the course of business and the admission of one of the principals, that an agent is allowed by the principals• to transcend the limit of the authority expressed in a written instrument, and, upon such evidence, a jury is justified in finding that an agent's real authority is more extensive than his expressed authority. (*Kolger* v. *Ins. Co.*, 10 Abb. Pr. [N. S.], 176; *Bunten* v. *Ins. Co.*, 4 Bosw. 254; *Pegram* v. *Carson*, 10 id. 505.) The rule that where an agreement is reduced to writing, it cannot be controverted or varied by parol evidence, applies only to the parties to the agreement. (*Brown* v. *Thurber*, 77 N. Y. 613; 58 How. Pr., 95.) If Swain violated the confidence reposed in him by the defendants, who reposed the confidence and made him the custodian of the property, they should suffer rather than the plaintiff, who acted upon the appearances which the defendants had created. (*Bates* v. *Cunningham*, 12 Hun, 21; *Hazard* v. *Fiske*, 83 N. Y. 287, 293.) Under the circumstances the plaintiff was entitled to judgment for the possession of the shellac, or, in the alternative, for the sum, fixed as the amount to be paid by the defendants if possession thereof is not delivered to the plaintiff. (Code, §1730; *Young* v *Willett*, 8 Bosw. 486; *Brewster* v. *Silliman*, 38 N. Y. 423; *Dows* v *Rush*, 28 Barb. 157, 158.)

*Charles B. Alexander* for respondents. The title to the shellac was always in the defendants Baring Bros. & Co., and the plaintiff never acquired any rights therein. (*F. & M. Nat Bk of Buffalo* v. *Logan*, 74 N. Y. 573, 577, 578, 583, 585, *Bk. of Rochester* v. *Jones*, 4 id. 497; *Haille* v. *Smith*, 1 Bos. & Pull. 563; *First Nat. Bk. of Toledo* v. *Shaw*, 61 N. Y. 624.) Delivery of a bill of lading in trust for the payment of a draft did not give the person receiving it power to sell. (*F. & M. Nat. Bk.* v. *Hazeltine*, 78 N. Y. 104.) The

pledge of the shellac by Swain was larceny. (*Bassett* v. *Spof ford*, 45 N. Y. 387; *Zink* v. *People*, 77 id. 114; *Hentz* v. *Miller*, 94 id. 64; *Collins* v. *Ralli*, 20 Hun, 246; 85 N. Y. 637.) The Factor's Act only applies to the case of goods stored by the owner, or one who has a right to store them. (*Collins* v. *Ralli*, *supra*; *Kinsey* v. *Leggett*, 71 N. Y. 387; *Hazard* v. *Fiske*, 18 Hun, 277; 83 N. Y. 287.) The owner of property which has been tortiously taken from him is not estopped from reclaiming it by the fraudulent act of the tortious taker, to which he was not a party. (*Mar. Bk. of Buffalo* v. *Fisk*, 71 N. Y. 353; *Kinsey* v. *Leggett*, id. 395; *M. & T. Bk.* v. *F & M. Bk.*, 60 id. 46; *First Nat. Bk. of Toledo* v. *Shaw*, 61 id. 300.) The Massachusetts statute does not help the plaintiff. (*Thatcher* v *Moors*, 134 Mass. 156, *Stollenwerk* v. *Thatcher*, 115 id. 224; *Nickerson* v. *Darrow*, 5 Allen, 419; *Mussey* v. *Beecher*, 3 Cush. 511; *Macomber* v. *Parker*, 14 Pick. 497; *Walker* v. *Staples*, 5 Allen, 34, *Thayer* v. *Dwight*, 104 Mass. 254; *Casey* v. *Cavaroc*, 96 U. S. 467; *Clark* v. *Iselin*, 21 Wall. 360; *Thompson* v. *Dolliver*, 132 Mass. 103; *Zuchtman* v. *Roberts*, 109 id. 53, *Ingalls* v. *Herrick*, 108 id. 351; *Thorndike* v. *Bath*, 114 id. 116, *Dempsey* v. *Gardner*, 127 id. 381; *Walcott* v. *Keith*, 2 Foster, 196; *Jenkyns* v. *Usborne*, 7 M. & G. 678; *Fuentes* v. *Montis*, L. R. 3 C. P. 268; 4 id. 93; *Stanley* v. *Gaylord*, 1 Cush. 536; *Moody* v. *Blake*, 117 Mass. 23; *Bearce* v *Bowker*, 115 id. 129.) The advance was not made on the faith of the bill of lading. (*Cartwright* v. *Wilmerding*, 24 N. Y. 521; *Bates* v. *Cunningham*, 12 Hun, 21; *Collins* v. *Ralli*, 20 id. 246.) The delivery of the shellac to Swain, under the agreement in evidence, made him the special bailee or agent of defendants, and gave neither Swain nor any third parties dealing with him any greater rights than they would have had if defendants had retained possession of the bills of lading. (*Hays* v. *Riddle*, 1 Sandf. 248; *White* v. *Platt*, 5 Denio, 269; *Clark* v. *Iselin*, 21 Wall. 360; *Lewis* v. *Graham*, 4 Abb. Pr. 106; *Brownell* v. *Hawkins*, 4 Barb. 491; *Case* v. *Bramley*, 18 Hun, 187; *Union Trust Co.* v. *Regdon*, 93 Ill. 458.)

Finch, J. The entire argument of the appellant turns upon the proposition that Swain was the general owner of the shellac, and the Barings merely pledgees. Upon that assumption the argument runs smoothly to its conclusion and encounters no serious obstacle. But the grave trouble is in the assumption itself, and the authorities which clash with it. The general subject was very thoroughly discussed in *Farmers and Mechanics' National Bank* v. *Logan* (74 N. Y., 568), and whether the doctrine there declared covers the facts now presented, and whether they have, or do not have vital distinguishing features, are the real subjects for our consideration.

The doctrine stated was, in substance, that where a commercial correspondent, however set in motion by a principal for whom he acts, advances his own money or credit for the purchase of property and takes the bill of lading in his own name, looking to such property as the reliable and safe means of reimbursement up to the moment when the original principal shall pay the purchase-price, he becomes the owner of the property instead of its pledgee, and his relation to the original mover in the transaction is that of an owner under a contract to sell and deliver when the purchase-price is paid. The authorities which sustain and the reasons which justify the doctrine need not be repeated, and it is required only that we determine whether it applies to and settles the case in hand.

There are some facts in the cited case which are not in this, and there are some in this which were not present in that; and to these and their effect attention must be directed. In that case the purchase was made by the brokers or agents of him who, as the ultimate vendee, may be termed conveniently, if somewhat inaccurately, the principal. Such brokers were buyers and sellers on commission, and it is said were the commercial correspondents to whom the rule refers and who needed and received its protection, while here the only commercial correspondents were Bancroft & Co. at Calcutta, who are not before the court and whose rights are not in question. But Bancroft & Co. were the sellers and not

the buyers of the shellac in their relation to the parties concerned. They passed their title either to the Barings or Swain, and while they were commercial correspondents in some sense, they were not such within the rule under discussion, for they advanced nothing on the credit of the property, and parted with title instead of taking it. The Barings, although bankers, were equally commercial correspondents, and they took title through the bill of lading and bought the property on their own credit. But if Bancroft & Co. be treated as the commercial correspondents, the case is not changed. Like Sears & Daw in the *Logan Case*, they bought the shellac on their own credit or with their own money, and got reimbursement by drawing upon the Barings, transferring title to them by the invoice and bill of lading to their order, as Sears & Daw did to the discounting banker in the *Logan Case*. The difference in the manner of making the advances is not material. In each case the bankers became owners or pledgees.

In the *Logan Case* the purchasing correspondent took from the vendor a bill of sale, as well as a bill of lading to his own order, but the Barings took only the bill of lading if the invoice to their order was not tantamount to a bill of sale. We do not deem that difference, if it was one, at all material. The title passed as effectually by the latter paper alone as if it had been preceded by the former, for we have uniformly held that the bill of lading is the evidence of title and is sufficient to vest the ownership and absolute control in him to whose order it is drawn. The purchase in the case cited seems to have preceded the shipment so as to make natural and convenient a bill of sale covering the interim. If it had been intended in this case to vest the general ownership in Swain and make him the purchaser, a bill of sale to him, or an invoice to his order, might naturally have been made, but as to the Barings the purchase and the shipment were practically coincident.

In the cited case, again, the bill of lading, as attached to, and sent forward with the discounted draft, had stamped

upon it a statement addressed to the original principal, that the wheat and the insurance of it, were pledged to the plaintiff as security for the payment of the draft; and that the wheat was put into his custody, in trust, for that purpose, not to be diverted to any other use until the draft was paid, and that upon his accepting and paying the draft, the claim of the plaintiff would cease. This appears to have been an effort to put in words upon the bill of lading the legal meaning of the transaction. It was not necessary to the certainty or scope of that legal meaning, and amounted only to a precaution. A similar distinction was sought to be drawn in the cited case itself, between it and *First Nat. Bank of Toledo* v. *Shaw* (61 N. Y. 283; 69 id. 624). In that the bill of lading was, when forwarded, accompanied by a letter explicitly directing the property to be delivered only upon payment of the specified purchase-money. The comment of the court in the *Logan Case* was: "Such agreement was but putting into terms the legal effect of the transaction in the case before us, for we have shown by authority that the taking of the bill of lading in the name of the plaintiff for its account, and the discount of the draft by it on the strength thereof *did* transfer to it the title to the wheat." Indeed, it seems to me that the title of the then plaintiff was rather weakened than strengthened by the matter stamped upon the bill of lading, for it speaks of the transaction as a pledge, when in truth it was an ownership, and it appears to be for that reason that the court, in upholding the banker's title founded on the bill of lading, speak of the latter "even with the modification thereof made by the matter stamped upon it," and "even as modified." So that the absence of the special indorsement in the case at bar at least does not weaken the bearing of the *Logan Case* upon it.

But a much more important suggestion made by the appellant is founded upon the terms of the written agreement between Swain and Kidder, Peabody & Co., as agents of the Barings, which was intended to govern and control the entire transaction. They issued a letter of credit addressed to Bancroft & Co., and authorizing them for account of Swain to

value on the Barings by bills for three thousand pounds sterling, and promised to accept and pay those bills "*if* accompanied by bills of lading for such goods filled up to the order of Messrs. Baring Bros. & Co., and by invoice of the same to their order, for account of whom it may concern." Swain, on his part, agreed to provide funds in London to meet such bills as should be drawn at their maturity, and that "all property which shall be purchased by means of the within credit, * * * together with the bills of lading for the same are hereby pledged and hypothecated to Messrs. Baring Bros. & Co. as collateral security for the payment as above promised, * * * and shall be held subject to their order on demand, with authority to take possession and dispose of the same at discretion, for their security and reimbursement." The argument upon this provision rests upon the words "pledged and hypothecated" and "collateral security," and avers as a consequence that Swain was, within the contemplation of the parties, general owner of the shellac, and the Barings merely pledgees. It is observable that Swain did not so understand it, for in his testimony he said: "Kidder, Peabody & Co. were the owners of these goods till they arrived in Boston." It has already been mentioned that a similar expression was used by the plaintiff in the *Logan Case* in the matter stamped upon the bill of lading, describing the wheat as "pledged" to the plaintiff, and as "security" for the payment of the draft, and so little did the use of the inapt words affect the plain and unequivocal substance of the transaction in the mind of the court that the use of the word "pledged" was not even made the subject of remark. It is further quite evident that from the moment of the shipment and the delivery of the bill of lading the absolute *jus disponendi* was in Kidder, Peabody & Co. by the very terms of Swain's agreement. They were at liberty to "dispose" of the property "at discretion," and either for "security" or reimbursement. It is also to be noted that what is spoken of as "pledged" is not merely the goods or the property, but the bills of lading also. These documents carry the title as well

as the right of possession, and the pledge or hypothecation is expressly applied to both. The meaning, assuredly, was that the title should pass. Very likely, as is suggested for the defendant, the transfer was rather in the nature of a mortgage in which the title passes than in that of a pledge in which the pledgor is general owner. Here, then, we have a case where no title was attempted to be given to Swain, where it was given to the Barings by the bill of lading to them, where they paid for the property by their own credit and money, where it was the very pith of the adventure that the shellac should furnish the means of meeting the price, where the invoice was to be made to their order, where the possession was to be theirs, where they were to have the right of disposal at discretion, and Swain was to have no control until payment of the draft. In such a case he could not be general owner, and an inference to that effect from an inapt expression cannot be indulged. So far the case, in our judgment, cannot be distinguished from that against *Logan,* upon the authority and reasoning of which the Barings must be deemed owners, and not merely pledgees.

The settlement of that point disposes of the case as affected by the factor's acts of this State and Massachusetts, except in a single respect. It is not pretended that plaintiff is protected under the provision which makes the transfer by an agent entrusted with the evidence of title and which has been made upon "the faith thereof" valid under some circumstances, even against the real owner; for the bill of lading with its endorsement was not shown to the plaintiff, and, in no manner affected his action. But the appellant insists that there was evidence enough to go to the jury that Swain was entrusted with the property for the purpose of a sale, or of obtaining advances upon it, and so, under the factor's act, the plaintiff's title as pledgee is to be protected. The course of business brought the shellac to the custom house and into the "general order" stores. From that custody it could only be removed by some action of Kidder, Peabody & Co. by force of their bill of lading. Swain applied for the papers to

Mr. Collins, who was their merchandise clerk, and who testifies: "I asked what he was going to do with the papers, and he said he wanted to enter them at the custom house and warehouse them for account of Baring Bros. & Co." Collins repeated that request to Peabody, who gave his consent. Thereupon Swain signed a receipt for the papers which specifies explicitly this one sole purpose for which they were put in his control, and, thereupon, they were indorsed in blank to enable Swain to make the entry and to warehouse the goods as agreed. Instead of doing that Swain entered them in the name of his broker, and then pledged them to plaintiff as security for a loan, the pledgee trusting to the representations of Swain and the warehouse receipt which he obtained. Peabody, so far as he was a party to the occurrence, fully corroborates Collins, and Swain was not thereafter called to deny, and did not deny, their version of the transaction. All that was later shown in rebuttal was á copy of the complaint in an action begun by Kidder, Peabody & Co. against Swain and Casey, who was the warehouseman. The opinion of the General Term shows so fully that the statements of that complaint, taken together, were, in no manner inconsistent with the evidence given for the defense as to make a repetition needless; and we may confine our attention to the evidence of Swain, and what it is claimed to establish.

Invariably the manner of dealing between the parties was like that developed in this case, so far as the written agreements were concerned. These were in two forms; one of them, that which we have described, which entrusted the shipping papers to Swain, solely that he might enter and warehouse the goods in the name of Barings, and the other which recited their sale and gave them into the custody of Swain to make delivery and collect the proceeds which were stipulated to "belong" to the Barings and to be handed over to them. Swain could not name a single instance in which one or the other of these papers was not signed by him, but it was sought to show by him that the action under them was loose and he was permitted to act differently. He said that

he had been in the habit of entering the goods, sometimes in his own name, and of selling or pledging the goods and paying the proceeds long after to meet the drafts maturing in London. Under the second form of receipt a sale was contemplated and payment of proceeds over to Kidder, Peabody & Co., and that they did not demand them immediately upon the sale and often accepted them later although in time for the drafts shows simply their confidence in Swain, but did not make their money his, and serves sufficiently to explain Peabody's alleged admission that Swain had been permitted to do as he pleased. And it is noticeable that the one single instance in which Swain says he can remember the facts of the deviation from the written stipulation was one under the second form of receipt in which after a sale he did not deliver over the proceeds promptly upon obtaining them. But he admits that he never had any consent to warehouse the goods in any other name than that of Barings, and out of thirty-four instances in which the papers were put in evidence, Swain, with the aid of the books was able to name but four instances in which he warehoused in his own name and pledged the goods. He does not pretend that the fact came to the knowledge of Kidder, Peabody & Co., and any such knowledge is denied by them. The argument here is that they must have known, and the jury might have found that they did know. Our opinion is with that of the courts below, that such a finding would not have been warranted. All that Swain's evidence tends to show is, that in transactions under form No. 1, he often did not at once turn over the warehouse receipts and was not questioned about them, and in transactions under form No. 2, was not immediately called upon for the proceeds received. There was not enough to destroy the force, and work a modification in the written stipulations of the parties, and no verdict to that effect would have been justified.

The judgment should be affirmed with costs.

All concur except RAPALLO, EARL and PECKHAM, JJ., dissenting.

Judgment affirmed.