### In re DUNLAP CARPET CO.

(District Court, E. D. Pennsylvania. July 8, 1913.)

No. 2,741.

1. BANKRUPTCY (§ 339*)—RIGHT TO CONTEST CLAIM—DISPUTE OVER OWNERSHIP.

Where the validity of a claim against a bankrupt estate is conceded and the only dispute is between two persons about the ownership, the controversy concerns such two persons alone, and the trustee, as representative of the other creditors, has no interest therein.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 525, 526; Dec. Dig. § 339.*]

2. BANKRUPTCY (§ 331*)—OWNERSHIP OF CLAIM—IMPORTED GOODS SOLD UNDER BANKER'S TRUST RECEIPT.

A bank which furnished the money or credit with which imported goods were purchased in the foreign country, taking the bills of lading in its own name and the usual trust receipt when the goods were sold by the

importer, continued to be the legal owner of the goods until title passed to the purchaser and after that to the account for the purchase price; and, where before payment of such account the purchaser was adjudged a bankrupt, the bank alone was entitled to prove the claim against the estate, of which right it was not deprived by the fact that through an error the purchaser credited the goods to the account of the importers, scheduled them as the creditor, and they made proof of the claim in their name, without repaying the bank its advances.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 520; Dec. Dig. § 331.*]

3. BANKRUPTCY (§ 328*)—PROOF OF CLAIMS—LACHES.

A creditor of a bankrupt is not chargeable with laches in proving his claim, where it is presented within the year allowed by the statute, unless the rights of others have been prejudiced by the delay.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 518; Dec. Dig. § 328.*]

4. BANKRUPTCY (§ 331*)—RIGHT TO PROVE CLAIM—OWNER OF LEGAL TITLE.

Where a bank was the owner of the legal title to a debt against a bankrupt for goods bought, by virtue of an importer's trust receipt covering the goods when they were sold and their proceeds, its right to prove the debt cannot be contested on the ground that a general accounting between it and the importers, involving many prior transactions, would show that the importers were not indebted to it; such accounting having no place in the bankruptcy proceedings.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 520; Dec. Dig. § 331.*]

5. BANKRUPTCY (§ 331*)—RIGHT TO PROVE CLAIM—ESTOPPEL.

The true owner of a claim against a bankrupt estate is not estopped from proving the same within the time allowed by the statute because another without right previously proved the same debt and sold its claim, where the purchaser had no knowledge at the time of the claim of the real owner and did not act in reliance on its representations or its silence.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 520; Dec. Dig. § 331.*]

In the matter of the James Dunlap Carpet Company, bankrupt. On review of order of referee. Reversed.

For prior opinion, see 171 Fed. 532.

Henry C. Huey, of Philadelphia, Pa., **for** trustees.

William Ewin Bonn, of Baltimore, Mo., for Assets Realization Co.

John P. Walsh and Ralph S. Rounds, both of New York City, and George Wentworth Carr, of Philadelphia, Pa., for Sovereign Bank of Canada.

J. B. McPHERSON, Circuit Judge. It may be useful to preface the following opinion by a short outline of what has taken place in the course of this particular dispute:

The Carpet Company was adjudged bankrupt on March 30, 1907, and within a week—on April 5—Joseph Reichardt of New York, trading under the firm name of Reichardt Bros., filed a proof of claim in which the bankrupt was declared to owe the firm $11,212.11 for three lots of wool delivered in December, 1906, and January, 1907. The claim encountered no objection and was therefore allowed, and a dividend of 25 per cent. was paid upon it in the following July.

Toward the end of September the claim was bought by the Assets Realization Company for 40 per cent. of its face value, and on October 31 another dividend (of 20 per cent.) was declared and was paid to that company. In February, 1908, the Sovereign Bank of Canada presented a claim identical in all essential details with the Reichardt claim, and thereupon it was manifest that hostile contestants were asserting ownership of the same debt. Recognizing this antagonism, the Assets Company immediately objected to the allowance of the bank's claim on a variety of grounds—some of them technical, but several going to the merits (see [D. C.] 171 Fed. 539)—and the claimants became involved at once in a controversy over the burden of proof: The District Court decided that the existence and formal proof of the Reichardt claim did not debar the bank from claiming to be the owner of the same debt; that the first duty of the bank was to offer prima facie evidence of its asserted right; but that the rule laid down in Whitney v. Dresser, 200 U. S. 532, 26 Sup. Ct. 316, 50 L. Ed. 584, had made the sworn proof of claim prima facie evidence that the averments contained therein were true. The District Court decided also, as a necessary corollary, that, while the bank's claim was open to attack, the Supreme Court had required the objectors to undertake the burden of repelling the prima facie case, and of proving that the claim should be rejected. In re Dunlap Carpet Co. (D. C.) 171 Fed. 532. Of course, the two claims being identical, it is manifest that only one can survive, and this situation has been accepted by the contestants, although no attack has been made in form upon the Reichardt claim by a motion to expunge. After the decision reported in 171 Fed., the Assets Company offered evidence in support of its objections, and upon the completion of its case the bank moved to dismiss the objections on the ground that they had not been sufficiently proved. The referee refused this motion on February 20, 1911, and directed the bank to offer evidence in rebuttal if it desired to do so. As this order was interlocutory, it could not be reviewed at that time. Accordingly, the bank proceeded in rebuttal, and the contestants were fully heard, both by oral and written evidence and by argument. In November, 1912, the referee made a final order disallowing and expunging the claim of the bank, and thereupon the present certificate was obtained; the two orders (of February and November) being thus brought up for review. As the final order raises all the questions that need be considered, the interlocutory order needs no discussion; but if I dispose of it formally the record will be simplified, and I therefore overrule the objections made thereto, and hold that the decision of the referee, requiring the bank to offer its evidence in rebuttal, was not an erroneous exercise of discretion.

Before taking up the two vital questions in the case, let me say a few words about the findings and opinion of the learned referee. Naturally these are such as are thought to be pertinent from the point of view that he regarded as controlling. But I have found myself unable to agree that this point of view is decisive, and it has seemed best on the whole to make no effort either to reconstruct the findings or to take them up separately; it has rather appeared that confusion would

be avoided if new findings were made upon such matters only as seem to be essential. In this connection it should be noticed in the first instance that the attitude of the bank to the trustees in bankruptcy has apparently been misapprehended. After the bank's claim had been proved prima facie, two additional dividends (of 20 and 10 per cent., respectively) were declared in March and November, 1908, and, as the contest over this money had then become well known to all concerned, the referee at first directed the trustees to withhold payment from both claimants; but he afterwards modified this order and permitted the Assets Company to receive the dividends upon giving security for repayment in the event of the bank's final success. A bond was accordingly given, and, so far as the last two dividends are concerned, the trustees are therefore well protected. It is not denied also that the Assets Company is abundantly able to repay the second dividend, but I lay no weight upon the satisfactory position of the trustees, for the bank is making no attempt in this review, and indeed none could be made, to hold the trustees liable to pay any of the dividends a second time—not even the first two, one of which (as already stated) was paid to Reichardt Bros., and the other to the Assets Company without security. Indeed, the brief of the bank expressly disclaims attacking the trustees now or hereafter, or attempting to hold them personally liable for any of the payments referred to. It is certain that no such liability could be the result of the present review, which is purely a controversy between the bank and the Assets Company concerning the title to property—especially the title to a chose in action—and does not put in issue the liability of the trustees at all. Moreover, it is highly important to observe that the trustees have still in hand a sum of money large enough to pay to the bank its share of all the dividends that have heretofore been declared; and of course, if the bank be lawfully entitled to receive, and does receive, payment of this sum, it will have obtained full satisfaction, and can have no further complaint against the trustees or against any other person. If the bank should thus succeed, the trustees would no doubt be under a duty to compel the Assets Company or its surety to repay the amounts of the third and fourth dividends, and would also be under a duty to recover from the Assets Company, if possible, the amount of the second dividend that was paid to that company in mistake. They would also be under obligation to recover from Reichardt Bros., if possible, the amount of the first dividend paid to them in mistake; and out of the moneys realized from these two sources—Reichardt Bros. and the Assets Company—a final dividend would be declared. But this is only to say, what is not likely to be disputed, that if dividends have been paid to the wrong claimant the trustees should endeavor to regain the money; and this is very far from deciding that they have incurred any liability under the circumstances of the erroneous payments. To state these facts is, I think, to show clearly that the present certificate raises, and can raise, no question concerning the liability of the trustees, and that further consideration of this subject may therefore be dismissed. The contemplated danger to the trustees probably had some influence on the referee's decision, and for that rea-

son I have spoken of the matter with more particularity than might otherwise have been necessary.

[1] At this point I may speak briefly of an argument made by the bank, but I think not earnestly relied upon, namely, that the Assets Company has no interest in the present controversy; the trustees alone being concerned. The decisions cited in support of this position do not sustain it. When the validity—that is, the very existence—of a claim is denied, either in whole or in part, this is no doubt a matter that concerns the other creditors generally, and the trustee is their proper representative in such a controversy; but where the validity of the claim is conceded, and the only dispute is between two persons about the ownership, I do not perceive how the other creditors are interested in the result of such a controversy. The bankrupt estate is liable, whichever contestant may succeed, and the dispute therefore concerns these two alone.

[2] It being clear therefore that the present inquiry does not affect the liability of the trustees in any way, and that the Assets Company has the right to object to the bank's claim, it remains to consider the two controlling questions, and of these the first may be thus stated: At the time of the bankruptcy, who owned the true legal title to the debt due by the Carpet Company? I may say at once that in my opinion the bank was the owner, and not Reichardt Bros.; and at the same time I may also express my regret that this prolonged and expensive dispute has been apparently promoted (at least in large measure) by an unfortunate oversight or misunderstanding of the Carpet Company. Instead of crediting the bank with the amount due for the wool, the company's books gave the credit to Reichardt Bros., and the books were therefore apparently in accord with the claim presented by that firm. But I think there is no doubt that this was a mistake—although perhaps an excusable mistake—and that the Carpet Company had sufficient information to put them on guard and to lead to the truth. And the truth was this: The full title to the wool was originally in the bank and was never divested. Without extending this opinion by somewhat tedious detail, it is enough to say that I understand the Assets Company to admit (and if not I find the fact to be) that all the wool—for it is conceded that the three shipments stand on the same footing—was imported under the well-known and the vastly important arrangement known as the "trust receipt" plan. By this arrangement a banker advances money to an intending importer, and thereby lends the aid of capital, of credit, and of business facilities and agencies abroad, to the enterprise of foreign commerce. Much of this trade could hardly be carried on by any other means, and therefore it is of the first importance that the fundamental factor in the transaction, the banker's advance of money and credit, should receive the amplest protection. Accordingly, in order to secure that the banker shall be repaid (or that he may be able to protect his acceptances) at the critical point—that is, when the imported goods finally reach the hands of an intended vendee in this country—the banker takes the full title to the goods at the very beginning; he takes it as soon as the goods are bought and settled for by his payments or acceptances in the for-

eign country, and (speaking generally) he continues to hold that title as his indispensable security until the goods are sold in the United States and the vendee is called upon to pay for them. This security is not an ordinary pledge by the importer to the banker, for the importer has never owned the goods, and moreover he is not able to deliver the possession; but the security is the complete title vested originally in the banker, and this characteristic of the transaction has again and again been recognized and protected by the courts. Of course, the title is at bottom a security title, as it has sometimes been called, and the banker is always under the obligation to reconvey; but only after his advances have been fully repaid and after the importer has fulfilled the other terms of the contract. At present, however, we have nothing to do with such a situation, and need not discuss it. The facts here show uninterrupted title in the bank down to the time when the goods were delivered to the Carpet Company, and show also that the terms of the contracts respecting the repayment of advances had not been fulfilled. As already stated, the trust receipt practice is of great value to importers; without it much of our foreign trade would be impossible, because the individual importer lacks the necessary capital and the foreign credit. An especially pertinent authority is a decision recently made in this circuit (Century Throwing Co. v. Muller, 197 Fed. 252, 116 C. C. A. 614), in which the subject has been examined with care by Judge Gray. He refers to some of the other decisions, and I may add Re Cattus, 183 Fed. 733, 106 C. C. A. 171; Re Coe (D. C.) 169 Fed. 1002; s. c., 183 Fed. 745, 106 C. C. A. 181.

It cannot be denied that under such trust receipt contracts the bank advanced large sums of money to Reichardt Bros. to help that firm in carrying on the business of importing. It follows therefore that when the wool in question reached this country the bank was the owner of the legal title; and it continued to be the owner, for there is no evidence that its title was ever divested up to the time when the wool was shipped to the Carpet Company, and when the bank became the owner of the debt thereupon arising. Indeed, Reichardt Bros. distinctly recognized the bank as the owner both of the wool and of the debt, if such recognition were of decisive importance (as I do not understand it to be).

[3] I do not see how it can be successfully disputed that the title to the wool was in the bank originally; and, if it were, it continued to exist in the bank unless divested in some way that is sanctioned by legal principles. How then is the title supposed to have passed to Reichardt Bros.? I think it cannot be seriously contended that the mere delay of the bank in presenting its claim can furnish the answer to this question. The rights of the bank and of the firm were fixed in March, 1907, when the bankruptcy proceedings were begun, and it is not easy to understand how the title to the wool or to the debt can be affected by the bank's subsequent delay in proving its claim. But if the argument from laches is really relied upon, the following reply would seem to be sufficient: The bank is charged with neglect in presenting its claim because it delayed the presentation for nearly a year. Congress, however, has expressly allowed a full year for this very

purpose, and the bank can hardly be blamed for exercising a right distinctly given by the statute. Of course, delay may sometimes be the source of harm to the rights of others, and when this is true a creditor may lose his right to profit by the belated proof of his claim; but if the delay does no harm he is certainly at liberty to insist upon all the advantages to which he is entitled by the exercise of his statutory right, namely, making proof within the statutory period. For example, if an estate had been fully settled within six months and the assets actually distributed among more diligent creditors, a tardy claimant might find himself in practice without a remedy. In effect he would not be allowed to do harm to others by disturbing an executed settlement, although he might have had a right to share in it if he had not been too leisurely. But there is no such ground for rejecting the claim now in question; creditors have not been injured, and will not be injured, by the bank's delay; they have all been paid their dividends, and no one lawfully entitled to such payment will be asked to refund. The bank took the risk that the trustees might not retain money enough to pay the dividends to which it is now making a tardy, although a lawful, claim; and, since the risk has fallen out in the bank's favor—the fact being that enough money is still available—the mere delay of 11 months furnishes no reason for denying a right to which the bank seems otherwise to be plainly entitled. It must not be forgotten that, when the Carpet Company went into bankruptcy, its creditors became the equitable owners of the assets in due proportion, and in its character as one of such creditors the bank's ownership continues unless it has done something to forfeit its right to claim dividends, or to estop it from setting up a true title against an otherwise unwarranted claim. So far as appears, it has forfeited no right, for it has hurt no one by the delay; certainly there is no evidence that delay has injured the Assets Company, for no legal injury is done by proving that the company never had a lawful claim, even if the bank may have been slow about putting in the proof. In other words, at the end of the inquiry it now appears that the Reichardt claim ought not to have been made at all. If I am right, it had no legal support, for the firm never owned either the wool or the debt due therefor by the Carpet Company, and it seems to follow irresistibly that the firm could not acquire title either to the wool or to the debt by the mere fact that (after the bankruptcy) the bank, who had always been the rightful owner both of the wool and of the debt, did not present its claim at an early stage of the proceedings. I am at a loss to understand how the title to property can be acquired in this way.

[4] But I can understand how title by estoppel in pais may arise, and this brings me to the second vital question that needs attention. Before taking it up, however, there is a preliminary word that should be said upon another subject. Much evidence was offered before the referee (and several of his findings are inferences from such evidence) concerning a subject that in my opinion is, and must be, outside the range of this inquiry altogether, namely, the details and results of the dealings between Reichardt Bros. and the bank. These were proved (not fully but to some extent) for the purpose of answering the ques-

tion whether the firm was or was not debtor to the bank at the time when this particular wool was imported and sold. As I understand the situation, no such subject as the mutual accounts between Reichardt Bros. and the bank is, or can properly be, involved in this collateral proceeding. The dealings between these contestants were numerous and complicated; they covered many transactions and involved many thousands of dollars and many securities. Apparently, the firm was of opinion that (if settlement were made) the balance of account was against the bank in December, 1906, and January, 1907, and probably this is the reason—I think it is the only reason—why the firm asserted ownership of the debt due from the Carpet Company, and of the wool whose sale gave rise to the debt. At least this would furnish an explanation of the promptness with which Reichardt Bros. presented their claim; and they have certainly enjoyed some advantages from being first on the ground, being, so to speak, the party in possession. But if the first and fundamental question be (as I understand it to be) solely and exclusively a question of title, the administration of the bankrupt estate of the Carpet Company is evidently not the proper proceeding in which the mutual accounts between the firm and the bank can be equitably settled. I repeat that the first question is: At the time of the deliveries in December and January, who was the owner of the wool, and who became thereupon the owner of the debt arising from the sales to the Carpet Company? To answer that question is to take a most important step toward deciding to whom the dividends should be paid by the trustees in bankruptcy of the Carpet Company; for the owner is prima facie the person entitled, unless he has somehow lost his right—and that will be considered in a moment. If the bank had—and I believe it had—the legal title both to the wool and to the debt, it had a full right to all the advantages arising from that legal position; and, although after an equitable adjustment of accounts the money thus coming into its hands from the Carpet Company's bankrupt estate might ultimately be found to belong to Reichardt Bros., these equities must be adjusted in some direct proceeding between the firm and the bank, to which both are parties and where one can obtain a direct and enforceable decree or order against the other. Such a controversy does not concern either the Carpet Company or its trustees or its general creditors, and is therefore purely collateral to the settlement of the bankrupt estate. Among other reasons why mutual accounts of rival claimants should be adjusted in a different forum, these may be noted: If the right to prove a claim must be decided, not according to the state of the title to the claim, but according to the ultimate balance of equities growing out of mutual accounts between claimants to the title, it is obvious that these accounts must be first settled before the conflict between or among the rival claimants can be determined. Meanwhile, the year allowed for filing claims may easily expire, and thus the claim be barred by the statute. Or if—to avoid this danger—all of the claimants are allowed to prove provisionally, it still cannot be known who should prevail until the accounts are settled. Must the administration of the bankrupt estate await the end of this collateral dispute in which the estate has

no interest whatever? The case before us illustrates what is likely to happen. For several years these claimants have been trying to settle their accounts in an incomplete and desultory fashion, and they have not settled them yet. The effort has necessarily been informal and unsatisfactory, and it has resulted in nothing. Neither party has a decree, and in this proceeding neither party could have a decree that could be enforced against the other. Meanwhile there has been much delay in administering a bankrupt estate that has no concern with the disputed accounts, but was only concerned with the question of disputed *title*—and that could have been decided in 30 days.

[5] Returning now to the question of estoppel, let us inquire whether what would be in effect a transfer of title from the bank to the Assets Company has been made out. The burden of proof is on the company, but I lay little if any weight upon this consideration; in my opinion the evidence establishes, not doubtfully but clearly, that the question must be answered in the negative. I think this may be shown without elaborate discussion. I find the relevant facts to be these: As part of its business the Assets Company buys claims against bankrupt estates, and it bought the claim of Reichardt Bros. on September 23, 1907, for 40 per cent. of its face value. The bargain was made between Rosenheim, an agent of the Assets Company, and Joseph Reichardt, and no element of estoppel can be made out from the surface of the transaction. In order that an estoppel in pais may enable the Assets Company to bar the bank from asserting title to the debt due from the bankrupt, several elements are indispensable: (1) The bank must have known that it was itself the true owner of the debt; I assume that it had such knowledge. (2) It must also have known that the firm of Reichardt Bros. was claiming to be the true owner of the same debt; I assume for the moment (but without deciding) that it had such knowledge also. (3) It must also have known that Reichardt Bros. were attempting to sell the debt to the company as the firm's own property, and the company must have bought the claim in reliance (to some extent at least) upon the representations or the conduct or the silence of the bank in reference to the Reichardt title. See cases cited in 11 Am. & Eng. Ency. of Law (2d Ed.) 427f et seq.; and in 16 Cyc. 759 et seq. Even if it be assumed that the bank was aware that negotiations for the purchase of the claim were pending between Reichardt Bros. and the Assets Company on the basis of the firm's ownership of the claim, it is not the fact that the company made the purchase in reliance upon anything that the bank said or did, or omitted to say or do. The Assets Company must go that far at least in living up to the rules that govern title by estoppel; and the company does not even aver that any representation, either by word or by conduct, was made by any agent of the bank. Indeed, it offered positive evidence (which I accept as true) that the bank was not known in the transaction at all. How could the company be relying in September, 1907, on the bank's silence—and it complains now of nothing except the bank's silence—if it be the fact (as Rosenheim swears) that the bank was not heard of in this connection until the following February? Some conflict may be found in the evidence

that refers to the bank's knowledge of negotiations between Reichardt Bros. and the Assets Company, but no conflict of evidence casts a doubt upon the fact that the company did not even know in September that the bank was being silent. The silence complained of now could not possibly have been relied upon then. The only representative of the bank to whom both contestants refer is Mr. Lanskail, and at the best I think there is much doubt whether Rosenheim saw him at all in connection with the transaction; but, even if he saw Lanskail, he certainly did not know that the latter was the bank's representative, and hence he could not have been trusting the bank. Moreover, Lanskail's agency for the bank ceased on June 30, 1907, and again it is doubtful at the best whether the negotiations between Rosenheim and Reichardt Bros. began at so early a date. But these matters may be left in doubt. This much is clear: The company relied neither on the statement or the conduct or the silence of any agent of the bank, and the facts therefore do not warrant the court in applying the doctrine of estoppel. The discussion need not be pursued, but I may add in a word that what happened was probably this: The Assets Company bought the claim at its own risk from Reichardt Bros., apparently trusting to appearances, some of which could no doubt be interpreted in a sense favorable to the Reichardt title. I say "could" be so interpreted, for these appearances were ambiguous, and could be interpreted with equal plausibility in favor of the bank's title; so that the company would have been more prudent if it had been more thorough in its preliminary examination and had then approached the bank directly for information. But I do not lay the least weight on this suggestion. It is easy for a party to be wise after the event, and much easier for a judge who has heard and considered testimony and argument; but I do lay weight on the decisive fact that the Assets Company during its negotiation for the claim could not have relied on the silence of the bank, since it was not even known that the bank was holding its peace.

If I am right in my decision of this second question, it is not important to add that in any event the Assets Company would only have a right to be made whole; that is, to be protected against losing the 40 per cent. that was paid for the claim. I need not dwell upon this, for the point does not arise if the company has not made out the charge of estoppel.

Before concluding this opinion I wish to acknowledge my debt to the unusually capable arguments of counsel, both oral and written. They left nothing to be desired, and if I have gone wrong it has not been for lack of intelligent guidance. One word about the form of the order that should be entered. In strictness the exact point now involved is the validity or invalidity of the bank's claim, and in similar strictness the validity or invalidity of the Reichardt claim is not yet in issue, as no motion has been made to expunge it. But the contestants agree—as indeed they must agree—that in substance the two claims are inseparably interwoven; both cannot be valid at the same time; so that a decision concerning one necessarily carries with it a decision concerning the other. It would be little less than folly to

compel the bank to make a formal attack upon the Reichardt claim, and solemnly to go again over the identical ground that has already been traversed by both parties at much length and with much pains. I assume that the parties do not wish to do anything so superfluous, but (as the subject was not mooted at the argument) I shall for the present confine myself to the matter in hand. I suggest, however, that the parties agree within 15 days that the following order may be amended by adding a clause expunging the Reichardt claim, so that a record, final in form as well as in substance, may be presented to the Court of Appeals. And in order to leave undisturbed the statutory time for taking an appeal, I shall postpone the entry of a final order until the expiration of the 15 days.

The clerk is therefore directed to enter the following order on July 23, 1913, with any amendment of which he may be advised by the court:

The order of the referee entered on September 30, 1912, disallowing and expunging the claim of the Sovereign Bank of Canada, is reversed, and the claim is hereby allowed.