Charles R. BARRETT, as Trustee of The Meyer & Brown Corporation, Bankrupt, and Chartered Bank of India, Australia & China, Appellants,

v.

The BANK OF THE MANHATTAN COMPANY, Appellee.

No. 10, Docket No. 23046.

United States Court of Appeals, Second Circuit.

Argued Oct. 14, 1954.

Decided Dec. 20, 1954.

Benjamin Weintraub, Levin & Weintraub, New York City, for Charles R. Barrett, appellant trustee.

S. Hazard Gillespie, Jr., Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for Appellant, Chartered Bank of India, Australia & China.

Gerhard R. Gerhard, New York City, for the Manhattan Bank.

Appleton, Rice & Perrin, New York City, for appellee. Root, Ballantine, Bushby & Palmer, New York City, of counsel.

Shearman & Sterling & Wright, New York City, for Chemical Bank & Trust Co. and National City Bank of New York, amicus curiae.

White & Case, New York City, William C. Knox, Jr., New York City, of counsel, for Bankers Trust Co. and New York Trust Co., amicus curiae.

Milbank, Tweed, Hope & Hadley, New York City, Roy C. Haberkern, Jr., New York City, of counsel, for Chase National Bank of the City of New York, amicus curiae.

Barnes, Voorhees & Congdon, New York City, Stuart K. Barnes, New York City, of counsel, for Guaranty Trust Co. of New York, amicus curiae.

Kelley, Drye, Newhall & Maginnes, New York City, Albert J. Walker, New York City, of counsel, for Hanover Bank, amicus curiae.

Henry Harfield, New York City, for Chemical Bank & Trust Co. and The National City Bank of New York, amicus curiae.

Before L. HAND, CHASE and MEDINA, Circuit Judges.

L. HAND, Circuit Judge.

The trustee in bankruptcy of the Meyer & Brown Corporation, filed a petition with the referee against the Manhattan Bank and the Chartered Bank; the Manhattan Bank moved to dismiss the petition for insufficiency on its face; the referee (Loewenthal), dismissed it, and Judge Conger affirmed his order. The case comes before us only upon the petition, whose allegations we must accept as true; and these are substantially as follows. The bankrupt is a New York corporation, doing a business in New York City and elsewhere in "importing, exporting and dealing in commodities." In December, 1947, it "entered into an agreement for trust receipt financing" with the Manhattan Bank, in accordance with which the statement, prescribed by § 58–e of the Personal Property Law of New York, McKinney's Consol.Laws, c. 41, was filed in the office of the Secretary of State of that state. On May 12, 1948, the Bank opened a letter of credit for the bankrupt for $150,000 "to provide, among other things, for the shipment of 500 bales of Hessian bags from Calcutta, India, to Manila"; and on June 28, the Bank paid the price of these bags, $115,031.80, and in exchange received the "documents of title" issued by the seller. The goods then "arrived at Manila," and, although the petition does not so allege, the case is to be disposed of on the assumption that the bankrupt had bought them, though it had never had possession of the "documents." On the same day, June 28, the Bank released these to the bankrupt in New York in exchange for a "trust receipt" and an acceptance of a draft, which on August 27th the Bank exchanged for a demand loan of $100,000. The bank-

rupt stored the bags in a warehouse in Manila until December 15th, when at the Bank's request it delivered the warehouse receipt to the Bank, by means of which the Bank later sold the bags. The purchase price is the putative preference. The petition alleged that under the Philippine law the Bank's security was invalid because the receipt was not recorded "in the province where the property is situated"; and because, when the bankrupt delivered to it the warehouse receipt, the Bank "had reasonable cause to believe that the transfer * * * would effect a preference."

■■ The only question is whether the Bank's "security title" to the bags, obtained when it paid the Indian seller's sight draft on June 28th, survived the surrender to the bankrupt of the "documents of title." Concededly the Bank regained control of the bags when the bankrupt gave it the warehouse receipt on December 15, 1948; but as the petition in bankruptcy was filed on August 1, 1949, more than four months thereafter, if that was a preference it was not voidable under the Bankruptcy Act, 11 U.S. C.A. § 1 et seq; but if it was voidable at all, it was so under § 15 of the New York Stock Corporation Law, McKinney's Consol.Laws, c. 59. The trustee and the Chartered Bank, which we shall call the "appellants," do not dispute that, if the bankrupt had bought the bags and imported them into New York, the "trust receipt" would have preserved the Bank's "security title"; but they argue that the statute covers only goods that are to be imported into the state where the receipts are issued, and that the Bank was therefore in no better position than a chattel mortgagee who has surrendered possession to the mortgagor. They further argue that the law of the Philippines does not recognize the validity of "trust receipts"; and that under the law of New York a court of that state must accept the law of the Philippines as its model in determining what interests arise in chattels situated in that country.

The argument that the Uniform Trust Receipts Act is limited to chattels that are to be imported into the state where the "trust receipts" issue would so circumscribe its ambit that it should not be accepted unless it is unavoidable. In Moors v. Kidder, 106 N.Y. 32, 12 N.E. 818, the validity of such a receipt had, it is true, the assent of only four out of the seven judges of the Court of Appeals, and they based their ruling upon the purely verbal distinction that "title" did not pass to the buyer, unlike a chattel mortgage. With deference we cannot understand how that difference could ever have been thought to disguise the patent character of the transaction as an unrecorded chattel mortgage; but as a prophetic step in advance, experience has amply justified it, for thirty states and two territories have passed the Act. It was devised to promote greater ease in the financing of purchases by buyers who had no available funds for immediate payment and must borrow the price until they could sell the goods; and it has rested upon a deliberate choice between that supposed benefit and the risk, inevitably arising from the deceptive credit so made available to the buyer. This being its foundation, we cannot see any reason to distinguish between chattels imported into New York, for example, and into New Jersey, Connecticut or Pennsylvania. The "appellants" construction would result in compelling needy importers to finance their purchases through a bank of the jurisdiction into which they import the goods, hardly a limitation that would appeal to the legislature of a state in deciding to pass the Act. So far, at least, as regards imports into any of the states of the Union it would largely defeat the purpose of the Act to limit it to occasions where the importation is into the state of the issue of the receipt. And, if this be true, we can see no reason to draw a line at the borders of the Union; there is

as little reason to assume that the State of New York should wish to limit the opportunity of its bankers to finance importers' purchases going to Canada or Mexico as those going to a state or territory; and this applies equally to imports going to countries not contiguous. In short, there must be something in the language of the Act that confines it as the "appellants" wish.

However, there is not a syllable in it that expressly, or by direct implication, suggests any such limitation. The "appellants" rely upon the statement of the Commissioners in their 1933 Handbook, p. 248, that "the Act regulates not only the 'orthodox' importing trust receipt transaction, but the analogous domestic transaction." If the argument from this is that the coupling of "domestic transactions," with " 'orthodox' importing transactions," implies that the "orthodox" importing transactions are also to be "domestic," we can see no reason to assume so. It begs the question to say that it was not "orthodox" to issue such receipts for chattels to be imported into other jurisdictions; indeed in Moors v. Kidder, supra, 106 N.Y. 32, 12 N.E. 818, the fons et origo of the whole doctrine, the bank surrendered the bill of lading and took the receipt in Boston, though the goods were imported into New York. The "appellants" also rely upon §§ 52, subd. 3(b), 58 and 58–e, subd. 1, of the Act. As to § 52, subd. 3(b) it validates the transaction, when the buyer takes the goods to manufacture or process them, preparatory to their sale, but in this there is nothing to indicate that the goods must be in the jurisdiction of issue. The argument drawn from § 58–e is that, since the statement there prescribed is necessarily filed in the jurisdiction of issue, it will give no notice to anyone taking the goods from the buyer, if the goods are in another jurisdiction; and under § 58 the filing of the statement is made a condition upon the continued validity of a receipt after thirty days. It is of course plain that the purpose of the statement is to give notice of the bank's "security title" to those who deal with the buyer (the "trustee"); and it is perhaps more likely that such persons would look to the records in the Secretary of State's office when the goods are imported into the state than when they are not. Yet it is most improbable that a third person dealing with the buyer would think it important to consult the records, even if he knew that the goods had been imported; and even then he would do so only in case he thought that the buyer might be financing the importation by means of trust receipts. Moreover, the statement protects the bank as much, when the goods have been moved to another state as when they remain in the state of issue, and it is surely most improbable that a third person dealing with the buyer in another state would ever seek the record. These considerations show that the protection that the statement gives is at best most unsatisfactory, and it is utterly insufficient to effect such a drastic mutilation of the general purposes of the Act.

For the foregoing reasons we hold that the doctrine is not to be confined to transactions where the goods are imported into the jurisdiction of issue; but the question remains whether it covers a transaction if at the time of issue the goods may be in, or later may be moved into, a jurisdiction which does not recognize the validity of "trust receipts." The answer to that question depends in the case at bar, upon what law a court of New York will take as its model in determining the rights and liabilities of the parties. "The old rule, expressed in the maxim mobilia sequuntur personam, by which personal property was regarded as subject to the law of the owner's domicile, grew up in the Middle Ages * * *. In modern times * * * that rule has yielded more and more to the lex situs, the law of the place where the property is kept

and used."[1] So much has this become true that the Restatement of Conflict of Laws[2] states generally that the lex situs will control; and the statutory law of New York is in accord: N. Y. Civil Practice Act, § 232(6). We do not forget the common gloss upon this doctrine that, when "title to a chattel is embodied in a document by the law which governed the chattel at the time when the document issued, title to the chattel is subject to the jurisdiction of the state which has jurisdiction over the document as a chattel" with exceptions not here relevant.[3] Moreover, the question whether a chattel is "embodied in a document is determined by the law of the place where the chattel is at the time when the document is issued."[4] We will assume, arguendo, that both these propositions are also the law of New York; and in the case at bar, the law of India, where the bags were, when the "documents of title" were issued, is that they do "embody" the chattels. Thus, it would follow, as the Bank says, that the validity of the "trust receipt" would depend upon the law of New York; but that would not answer the present inquiry whether the doctrine of the "embodiment" of the chattel in the document should be applied, even though the chattel be in a jurisdiction which refuses to recognize "trust receipts." To meet the possibility that it would not be applied, the Bank cites the decision of the Supreme Court of the Philippines in Philippine National Bank v. Viuda e Hijos de Angel Jose, 63 Philippine 814 (1936). The plaintiff in that case was a Philippine bank that had received in Manila a bill of lading for 1000 drums of gasoline and paid the full price for it to the California seller. The buyer was the Coleman Company in Manila, which obtained possession of the drums by giving to the bank a "trust receipt," similar to that at bar in exchange for the bill of lading. The Coleman Company, having thus got possession of the drums, stored them in one of the bank's warehouses in Manila, "so that not a single drum could be withdrawn therefrom without its knowledge"; though it does not appear that the Coleman Company was unable to withdraw the drums without the bank's consent. The Coleman Company sold the drums to a railroad company in Manila which agreed to pay the bank; but before payment was made the defendant, which had obtained judgment against the Coleman Company, garnished the purchase price, and the question was whether the bank or the defendant was entitled to the money.

The court accepted the statement made in another Philippine case, People v. Yu Chai Ho, 53 Philippine 874, 876, which had in turn cited with approval, and quoted at length from, In re Dunlap Carpet Co., D.C., 206 F. 726, a decision of Judge McPherson in 1913, that stated in detail, and relied upon, the doctrine of "trust receipt." The Philippine court in the later case went on to say that it was "reasonable that contracts contained in trust receipts, as the one entered into between the plaintiff-appellant and Coleman Petroleum Products Co., Inc., should be recognized and protected by the courts because they are permitted by law." Perhaps, the drums were never out of the control of the bank, for, as we suggested, it is not clear whether the Coleman Company could withdraw them from the warehouse without the bank's consent; and if so, the bank had never lost its lien. However, if that had been true, it is hard to see why the court resorted to the doctrine of "trust receipt" to in-

1. Pullman's Palace-Car Co. v. Commonwealth of Pennsylvania, 141 U.S. 18, 22, 11 S.Ct. 876, 878, 35 L.Ed. 613; Frick v. Commonwealth of Pennsylvania, 268 U.S. 473, 493, 45 S.Ct. 603, 69 L.Ed. 1058; Freeman v. Hewit, 329 U.S. 249, 258, 67 S.Ct. 274, 91 L.Ed. 265.

2. Restatement of Conflict of Laws, §§ 49 and 102.

3. Restatement of Conflict of Laws, § 50.

4. Restatement of Conflict of Laws, § 261 (1).

validate the defendant's levy in execution; and most of the opinion becomes irrelevant. Moreover, even though the court might have disposed of the appeal without recourse to the doctrine, it is plain that it meant to accept it, and the opinion is adequate evidence of the law of that country which we should and do accept.

The order must therefore be affirmed; but, in order that the scope of our decision may be properly circumscribed, it must be understood that we do not hold that the fiction—for it is a fiction—that the chattel is "embodied in a document," must prevail against interests in the chattel that the lex situs creates by reason of transactions between the holder of the receipt and third persons. We base our decision strictly upon the Philippine law, without indicating how we might decide the issue, had there been no evidence as to, and, a fortiori, had there been evidence against, the validity of "trust receipts" in the Philippines.

Order affirmed.